The Franklin Coal Company *vs.* William McMil-
lan, Kate Coyner and William Coyner, her
husband.

*Admissible evidence—Principal and agent—Inadmissible evi-
dence—Tenant for Life of Coal lands—Rights as such—
Measure of Damages in. an Action on the case for Mining
and removing Plaintiffs' Coal.*

A witness offered on the part of the plaintiffs stated that he was the boss-
miner of the defendant, a coal company, in the year 1855, and considered
it was his duty as such boss-miner to know the boundaries and lines of the
defendant's property; that while engaged in superintending the cutting of
timber in said year on the defendant's property for use in its mines, the
general superintendent of the defendant in charge of its mines and works,
pointed out to the witness the division fence then standing between the plain-
tiffs' and defendant's property, and told him not to cut over said line, or
allow timber to be cut over it; and that the division fence shown him on
said occasion stood on the line of the old fence as located by the plaintiffs.
Held :

That such evidence was admissible for the purpose of showing knowledge on
the part of the defendant of the lines of its property.

The testimony of an absent witness taken down on a survey by the surveyor,
and returned in his book of explanation, is inadmissible where no sufficient
evidence has been offered to prove that the absence of such witness is caused
by physical inability which rendered him unable to attend.

Prior to the beginning of the life estate in certain coal lands, from an opening
at a place where the coal cropped out, coal had been taken and used for
domestic purposes, but it never had been mined for market. Under such
circumstances the tenant for life would not have the right to open the mine
for the purpose of mining coal for sale, but only the right to use the coal
for such purposes as it was used when the life estate began.

If in an action on the case to recover damages for mining and removing coal,
brought by parties entitled to the reversion in the land upon which the
trespass was committed, it be shown that the defendant dug and mined coal
from said land, and made excavations thereunder, and removed the coal so

mined, and thereby injured the coal left remaining as pillars, or by bad mining or otherwise rendered it difficult or impossible for the plaintiffs to get out such pillars or remaining coal or rendered it of less value to them, they are entitled to recover for such coal as cannot be removed, what it was worth per ton in its native bed, and for so much of such coal as can be removed but with increased expense, damages to the extent that the evidence may show such coal has been thereby diminished in value.

And if the defendant in mining and excavating under said lands, thereby rendered it more difficult and expensive for the plaintiffs to obtain access to the coal under said lands, and depreciated the value of said remaining coal, the plaintiffs would be entitled to such damages as they sustained from the depreciation of said lands and the increased difficulty and expense of obtaining access to the coal remaining therein.

In such action the proper measure of damages for mining coal under the lands of the plaintiffs and removing the same is the value of the coal per ton when first severed from its native bed, and before it is put upon the mine cars, without deducting the expense of the severing; and if the defendant at the time of mining and removing said coal, knew that the lands were not its own, such further damages may be awarded the plaintiffs as the facts and circumstances accompanying such mining and removing of the coal may warrant.

APPEAL from the Circuit Court for Allegany County.

Lewis B. McMillan being seized in fee simple of certain lands lying in Garrett County, known as "Joseph's Farm," which included military lots Nos. 3836 and 3837, devised the same to Elizabeth McMillan, his wife, for life and after her death to the appellees, William McMillan and Kate. Coyner their only children, in fee. This was an action on the case brought by the appellees to recover damages of the appellant.

The declaration averred that said lands were underlaid with valuable veins and seams of coal and other minerals, but had no mines or openings thereon in the life-time of the said Lewis B. McMillan; and that while said lands were in the possession and occupation of Elizabeth McMillan, the life tenant, the defendant broke and entered into them, tunneled thereunder and made and sunk divers

mines, drifts, headings, &c., and raised and conveyed away large quantities of earth, coal and other minerals, and converted them to its own use; and further that the defendant mined and excavated said coal and other minerals in such a careless and unskillful way as to render the mining and removing of the remaining minerals more difficult and expensive, and failed to leave proper supports for the surface; by all which premises the plaintiffs had been "injured, prejudiced and aggrieved in their said reversionary estate and interest in fee simple" in the said lands.

The plaintiffs, by a petition stated that they had brought this action for waste committed on the lands described in the declaration, and could not show the extent of the coal dug upon the land by the defendant, and the damages sustained by the plaintiffs, without a warrant of resurvey to lay down on a plat the outlines of their lands, the extent of coal therein, the amount dug and carried away, and the portions of the mines that had fallen in and filled up from the unskillful mining of the defendant; they therefore prayed for a warrant of resurvey which was accordingly issued.

The defendant pleaded not guilty and limitations, and issues were joined.

This suit was instituted in Garrett County and at the instance of the plaintiffs was removed to Washington County whence, at the instance of the defendant, it was removed to Allegany County where it was tried.

Under the warrant of resurvey the surveyor of Garrett County proceeded to resurvey and locate the lands of the plaintiffs and the defendant, and such other adjacent lands as were thought necessary, and the locations so made were returned into Court.

It is not deemed necessary to set them out—they were offered in evidence as also copies of certain patents; other evidence was also introduced.

*First Exception.*—The plaintiffs in order to maintain the issue on their part joined offered to prove by one Wm. G. McMillan, that he was the boss miner of the defendant in the year 1855, and that he considered 'it was his duty as such boss-miner to know the boundaries and lines of the defendant's property; and that one Thomas G. Kerr was the general superintendent of the defendant, in charge of its mines and works; and that he, McMillan, was superintending the cutting the timber in said year on defendant's property, for the use of defendant in its mines; and that while so engaged, said Kerr pointed out to him, McMillan, the division fence then standing, between the plaintiffs' and defendant's property, and told him, McMillan, not to cut over said line, or allow timber to be cut over it; and that the division fence shown him by Kerr on said occasion, stood on the line of the old fence, as located by the plaintiffs. The defendant objected to the Court allowing said evidence to go to the jury, but the Court overruled said objection, and permitted said evidence to be given to the jury, for the purpose of showing knowledge on the part of the defendant of the lines of its property. To this ruling of the Court the defendant excepted.

*Second Exception.*—The defendant, in order to maintain the issue on its part joined, offered to read in evidence from the surveyor's return and book of explanation the testimony of Wm. Warnick, being as follows: " My age is seventy-five years; I was born in the house which stood upon the ground where I now stand; that is just where the door of said house stood; I have seen the reference lines run from this spot to the beginning of lot No. 3825." The testimony of the witness having been taken down on the survey by the surveyor, and returned in his book of explanation. The defendant having first proven by Dr. D. E. Miller, a practitioner, at Westernport, that he had visited said Warnick at his house twice within the past week, and found from the examination there made, that it

would be exceedingly dangerous for him to come to Cumberland as a witness in this cause; that he, Warnick, was about seventy-nine years of age, and that he, Dr. Miller, did not think he ever would be able to appear as a witness in this Court; Warnick's symptoms, as described by Dr. Miller, were severe pains in the head and back and limbs, and general debility and failure of strength, owing to old age and partial paralysis. On cross-examination, Dr. Miller stated, that he lived about six miles from Warnick's house; that Warnick lived about two miles from Barton, and that there was a railroad from Barton to Cumberland; that he was not the regular physician of Warnick, and never saw him before the two interviews; that he had one about ten days, and the other four days, before his evidence was given; that he went to see him at the instance of the superintendent of the defendant, and was not sent for by Warnick; knew nothing about Warnick, as to his general habits or health before his two visits; that he examined him, and found his pulse light, and complained of dizziness and pain in the head. And then plaintiffs proved, on their own examination of Conrad Fazenbaker, that he is the brother-in-law of Warnick; that he saw him Tuesday week; he was very feeble, as he has been for several years; sometimes weak and sometimes stronger. Plaintiffs then proved by Norman Jacobs, that he was a neighbor of Warnick's—acquainted with him all his life; saw him about four weeks ago going to the mill with a grist, riding on a horse, and carrying a grist with him; he has to come by way of Barton to get to the mill, and the mill was about one and a-half miles from Barton; he was as well then as usual, and as smart as men of his age usually are; there are several physicians at Barton, and Dr. Crawford, of Barton, is Warnick's regular physician, and attends his family when sick; subsequently the surveyor was being examined in reference to some alleged discrepancies between his statement at the trial and his return,

and in explanation he read, in the presence of the jury, the evidence that has been stated above, as that sworn to on the survey by Warnick, without objection on the part of plaintiffs. But the Court refused to allow the said evidence to be read to the jury when offered by the defendant; to this refusal of the Court the defendant excepted.

*Third Exception.*—The plaintiffs offered fourteen prayers, the second, third and fifth of which the Court rejected, the others it granted. The following it is deemed sufficient to insert:

11. That if the jury believe from the evidence in the cause, that the defendant dug and mined coal from the tract of land called "Joseph's Farm," as located by the plaintiffs, or any part thereof, and made excavations thereunder, and removed the coal so mined, and thereby injured the coal left remaining as pillars, or by bad mining or otherwise rendered it difficult or impossible for the plaintiffs to get out such pillars or remaining coal, or rendered it of less value to them, then the plaintiffs are entitled to recover such sum per ton for such coal as cannot be removed as they shall find from the evidence it was worth in its native bed, and such damages for so much of such coal as can be removed, but with increased expense, as they may find such coal to be diminished in value.

12. That if the jury shall find from the evidence in the cause, that the defendant mined and excavated under the tract of land called "Joseph's Farm," as located by the plaintiffs, if they find said location correct, and thereby rendered it more difficult and expensive for the plaintiffs to obtain access to the coal under said lands, and depreciated the value of said remaining coal, then the jury may allow the plaintiffs such damages as they may find the plaintiffs have sustained from the depreciation of said land, and the increased difficulty and expense of obtaining access to the coal remaining therein.

13. That if the jury shall believe from the evidence in this cause that the defendant mined out coal under the land

called " Joseph's Farm," as located by the plaintiffs, and that said location is correct, then the plaintiffs are entitled to recover such sum per ton as the jury may find said coal so mined was worth, when first severed from its native bed, and before it was put upon the mine cars, without deducting the expense of severing said coal from its native bed.

14. That if the jury find from the evidence in the cause, that the defendant at the time of mining out the coal and excavating under said land, knew that said lands were not its own, then the jury are not limited to the actual amount of damages committed, (if they shall find any have been committed,) but may find such further damages as the facts and circumstances accompanying such mining of coal and excavating under said land may warrant.

The defendant submitted ten prayers, the first, fourth and eighth of which the Court granted ; the others it refused, but substituted an instruction in place of the seventh prayer rejected. The ninth prayer was withdrawn. The following prayers only it is deemed necessary to insert :

2. If the jury find from the evidence in the cause, that the defendant broke and entered into the lands spoken of in the evidence, and dug out and carried away coal therefrom within three years prior to the institution of this suit, and that said lands were within the boundary lines of the property devised by Lewis B. McMillan to Elizabeth McMillan for life, and after her death to the plaintiffs in remainder, and that said life tenant was in possession of said property at the time of said digging and carrying away, and is still alive and in possession thereof, then the plaintiffs cannot recover under the pleadings and evidence in this case.

3. If the jury find from the evidence in the cause, that the defendant broke and entered into the lands spoken of in the evidence, and dug out and carried coal therefrom, and that said lands were within the boundary lines of the

property devised by Lewis B. McMillan to Elizabeth McMillan for life, and after her death to the plaintiffs in remainder, but also find that the mine of said plaintiffs was already open as shown on the plat marked " C. O.," and had been so open in the life-time of said Lewis B. McMillan, and that said life tenant was in possession of said property at the time of said digging and carrying away, and is still alive and in possession thereof, then the plaintiffs cannot recover under the pleadings and evidence in this case.

5. If the jury believe from the evidence in the cause, that the defendant broke and entered into the lands of the plaintiffs at the places located on the plats, within three years prior to the institution of this suit, and that the said defendant mined out coal from said lands, but that in so doing the defendant believed itself to be the *bona fide* owner of the lands so taken and entered, and of the coal so mined out, then the plaintiffs can only recover such sum as the jury may find from the evidence was the value of the said coal so mined out before it was severed from the mine.

To the action of the Court in granting certain of the plaintiffs' prayers and in rejecting certain of its prayers, the defendant accepted. The verdict and judgment being for the plaintiffs, the defendant appealed.

The cause was argued before Bartol, C. J., Stewart, Brent and Robinson, J.

*Arthur W. Machen* and *Orville Horwitz,* for the appellant.

*S. A. Cox, William Walsh* and *Thomas J. McKaig,* for the appellees.

Bartol, C. J., delivered the opinion of the Court.

For the reasons stated in the opinion of our brother Robinson, we all agree that the instructions given to the jury by the Circuit Court, in regard to the locations made

by the plaintiffs and defendant, were correct, and that it was not error to grant the first, fourth, sixth, seventh, eighth and ninth prayers of the plaintiffs, and also that the second and third prayers of the defendant were properly refused.

We are also of opinion that the evidence offered by the plaintiffs, contained in the first bill of exceptions, was properly admitted for the purpose therein stated. But upon the question of the measure of damages, a majority of the Court think there was no error in the rulings of the Circuit Court, and that they ought to be affirmed.

The evidence in the case proves that the defendant's agents, while engaged in mining coal upon its own land, lying contiguous to that of the plaintiffs, extended their mining operations beyond the limits of its own land into that of the plaintiffs, and removed therefrom a quantity of coal, and this suit was brought to recover damages for the trespass. The form of action is in case, brought by parties entitled to the reversion in the land upon which the trespass was committed ; but in our judgment, so far as the question arises in the present case, the rule regulating the measure of damages is the same as if the suit were in trespass by parties owning the fee, and entitled to the immediate possession.

No valid objection can be made to the granting of the eleventh and twelfth prayers of the plaintiffs, and we do not understand the appellants as complaining of them. They are identical with the instructions affirmed by this Court in *The Barton Coal Co. vs. Cox*, 39 *Md.*, 1.

The objection relied on by the appellant is to the granting of the plaintiffs' thirteenth, and the refusal of the defendant's fifth prayer.

By the former the jury were instructed that the measure of damages was the value of the coal when first severed from its native bed, without deducting the expense of severing it. The defendant's fifth prayer asserts the proposi-

tion, that if the defendant mined out the coal from the plaintiffs' land, *and in so doing believed itself to be the bona fide owner of the land and of the coal so mined,* then the measure of damages is the value of the coal in its native bed, before it was severed from the mine.

The question presented by these prayers is not a new one in this Court, it was fully considered and decided, we think, in the case of *The Barton Coal Co.* before cited.

There the Court below granted the plaintiffs' *third* prayer, identical with the thirteenth prayer in this case, and refused the *second* prayer of the defendant, which was in these words:

"If the jury shall find, etc., that the defendant dug out and carried away the coal of the plaintiffs, without knowing that it was trespassing upon the property of the plaintiffs, and believing that it was its own coal, then the measure of damages for such digging and carrying away of coal is the value of the coal in the mine."

The ruling of the Circuit Court upon these prayers was affirmed. After the decision was rendered, an application for a re-hearing was made by appellant's counsel, in which they asked the Court to re-consider its decision upon the question of damages, but the application was refused.

In the opinion then filed, the decided cases were examined, and the question carefully considered, and the Court adopted as the true rule that laid down in *Martin vs. Porter, Morgan vs. Powell* and *Wild vs. Holt.*

We have examined all the cases which have been cited in the argument, and have discovered no sufficient reason for departing from the decision so recently made by this Court; nor have we seen any good reason to doubt that the rule then announced is upon the whole a sound and salutary one, which, while it awards no more than a just compensation to the party injured, will, as said by Baron PARKE, "tend to prevent trespasses of this kind."

We think no real distinction can be drawn between this case and that of the Barton Coal Company.

There this Court held the rule applicable, though the defendant was not a willful trespasser, but *"dug the coal without knowing that it was trespassing upon the property of the plaintiffs, but believing it was its own coal."*

It is said that in that case there was no dispute or question about boundaries, and that it was *negligence* in the defendant to go beyond its own lines. But the trespass was committed under ground, where the lines were not easily ascertained. Trespasses on the land of another, if not willful, always imply some degree of negligence. In this case the defendant's excuse is, that it claimed to be the owner of the land. But it has been shown by the proof and by the verdict that its claim was not well founded. As said in *Maye, et al. vs. Tappan,* 23 *Cal.,* 306. " Where a party has the means of ascertaining the dividing line, he is guilty of negligence in not ascertaining its location."

In this respect, therefore, this case is not to be distinguished from that of the Barton Coal Co.

Considering that case as decisive of the present, we have not thought it necessary to make further reference to the authorities, or to discuss the proposition there decided over again.

Upon the *second* bill of exceptions, we are of opinion that the ruling of the Circuit Court therein stated furnishes no ground for reversal, because we think the evidence offered for the purpose of proving that the absent witness was unable to attend, by reason of physical inability, was not sufficient to establish that fact.

Finding no error in the ruling of the Circuit Court, the judgment will be affirmed.

*Judgment affirmed.*

(Decided 24th July, 1878.)

ROBINSON, J., filed the following opinion, dissenting in part.

The appellees are entitled in remainder to a tract of land, known as "*Joseph's Farm*," which includes military lots Nos. 3836 and 3837 ; and the appellant is the owner of an adjoining tract, which includes lots 3825, 3826 and 3835.

It appears that the appellant while working its own undisputed property extended its drifts so far northward as to run under the land claimed by the appellees, and this suit is brought to recover damages for coal thus mined and taken away.

On petition of the appellees a warrant of resurvey was ordered, and under it both parties located their pretensions. The two adjoining tracts call for the same beginning, "*a marked chestnut tree, standing* 2 *degrees west,* 40 *perches from Joseph Warnick's house.*"

The tree and house having disappeared, the plaintiffs located the beginning at point A, and the defendant located it at point M, and the title to the land from which the coal was taken depends upon the correctness of the locations thus made by the parties respectively.

The jury found in favor of the plaintiffs' location, and the *main question* in this case is, the rule by which the damages were to be estimated.

The cost of mining coal, it is well known, is much greater than the value of the coal in the bed, as much, according to some of the reported cases, as five times greater. The plaintiffs however contend, that they are entitled to the value of the coal, without deducting the cost of its severance, or in other words, to the value of the coal when it first became a chattel. On the other hand, the defendant contends that if the coal was mined under a *bona fide* claim *of title to the land*, and not taken *willfully* or through negligence, the plaintiffs are entitled to recover only such damages as they have actually sustained—in

other words, to the value of the coal as it lay in its native bed.

The question of damages in actions of this kind was recently considered by this Court in the *Barton Coal Company's Case*, 39 *Md.*, 1, and it was held that the plaintiffs were entitled to recover the value of the coal when it first became a chattel, without deducting the cost of mining. Although I did not concur in that opinion, yet it is my duty to recognize it as the law of this State on the subject, and I do not propose to question in any manner the correctness of the rule thus laid down. On the contrary, I admit that unless this appeal is distinguishable on principle from the case relied on by the appellees, the decision therein rendered is conclusive of the question now under consideration.

There, as in this case, the parties were owners of adjoining tracts, but the *feature, and the broad feature*, which distinguishes the two cases is that in the *Barton Coal Case*, the defendant *set up no title to the land from which the coal was taken.* It was claimed that owing to the mountainous character of the country, and the difficulty of ascertaining the precise line separating the two tracts, the defendant had inadvertently trespassed upon the plaintiffs' land, believing at the time he was mining on his own property. And accordingly the Court was asked to instruct the jury that if they should find the defendant " dug and carried away the coal of the plaintiffs without knowing that it was trespassing upon the property of the plaintiffs, and believing that it was its own coal, then the measure of damages to be recovered for such digging and carrying away of coal is the value of the coal in the mine." (*2nd prayer.*)

The ruling of the Circuit Court in refusing this prayer was affirmed, and it was held under the decisions in *Martin vs Porter*, 5 *M. & W.*, 551, and *Morgan vs. Powell*, 3 *Adolp. & Ellis*, 281, and *Wild vs. Holt*, 9 *Mees. & Wells.*,

472, that although the trespass was inadvertently committed, the plaintiff was entitled to the value of the coal after it was mined. The question of damages for coal mined under a *bona fide* claim of title to the land did not arise, nor can it be said that it was considered, much less decided by the Court    Nor did it arise in *Martin vs. Porter, Morgan vs. Powell,* or *Wild vs. Holt,* decisions relied on in support of the rule adopted in the *Barton Coal Case.* On the contrary, the question in each of these cases was the measure of damages to which the plaintiff was entitled for coal taken willfully or through the negligence of the defendant.

When, however, the question did arise in *Wood vs. Morewood,* 3 *Adol. & Ellis,* N. S., 440, *note,* Baron PARKE told the jury " that if they found for the plaintiff, they were to determine what damages should be given ; that if there was *fraud* or *negligence* on the part of the defendant they might give as damages the value of the coals at the time they first became chattels, on the principle of *Martin vs. Porter,* but if they thought the defendant was not guilty of *fraud* or *negligence, but acted* fairly and honestly in the full belief he had a right to do what he did, they might give the fair value of the coals, as if the coal field had been purchased from the plaintiff." Thus we find that this distinguished Judge, who decided *Martin vs. Porter,* and who upon motion to set aside the verdict expressed himself pleased with the rule laid down in that case, expressly deciding that the rule did not apply where the coal was mined under a claim of title.

And in the subsequent case of *Wild vs. Holt,* we find the same Judge interrupting Mr. Knowles in argument by saying " that *Martin vs. Porter* establishes as against a *wrong-doer* that no such abatement ought to be made, but the jury were at liberty to give as damages the full value of the coals when they first existed as chattels in consequence of the trespass. Where there *is a real dispute the rule is different*

When the question again arose in *Hilton vs. Wood,*
*Law Rep.,* 4 *Equity,* 432, Vice Chancellor MASLINS, refer-
ring to the decisions at law says,

"It is clear upon the authorities a different principle is
applicable when coal is taken inadvertently, or as in the
present case under a *bona fide belief* of title, and when it is
taken *fraudulently* with full knowledge that he is doing
wrong, or in other words committing robbery."

This case was followed by *Jegon vs. Vivian,* L. R., 6
*Chan.,* 760, in which *Martin vs. Porter,* and *Morgan vs.
Powell,* were referred to, and the rule recognized by these
cases was strongly pressed in argument by Mr. Jessel, but
Lord Chancellor HATHERLY said :

"It strikes me as a strong measure to give a man in-
stead of the value of his coal the great advantage of hav-
ing it worked without any expense for getting and hewing.
It seems a rough and ready mode of doing justice, though
the remark that a willful trespasser ought to be punished
is worthy of observation, and further as was said by one
of the Judges, when you deprive a man of his property in
this way you deprive him of the management and control
of his own property, and he might have made a better
bargain. All that, however, is a matter of speculation,
and it seems to me the Judges have founded their decision
upon the ground of *willful* trespass as in *Martin vs. Por-
ter,* where Baron PARKE expresses himself pleased with the
the rule. But the same learned Baron in *Wood vs. More-
wood* held that where there was a *bona fide* claim of title
the trespasser could be allowed for hewing as well as for
other expenses," and the Lord Chancellor adopted the
rule laid down in *Wood vs. Morewood.* We come now to
the *United Merthy Collieries Company,* L. R., 15 *Equity,*
46, decided in 1872, the last case to be found in the Eng-
lish Reports on the subject, in which the rule in *Martin vs.
Porter* was again pressed, but Sir JAMES BACON said that
although the trespass was fully proved yet as there was no

suggestion of fraud, it was a case for the application of the more lenient rule, and held that the defendant was liable only for the value of the coal, deducting the cost of its severance and carrying it to the pit's mouth.

. Such, then, is the unbroken array of English decisions beginning with *Wood vs. Morewood*, and coming down to the *United Merthy Collieries Case*, in which it has been uniformly held both at *Law and in Equity*, that the severe rule laid down in *Martin vs. Porter* has no application where the coal is mined under a *bona fide claim of title*, and held, too, by the very same distinguished Judge who decided *Martin vs. Porter.* No case was cited in argument, nor have I been able to find one in England in which a contrary doctrine is held ; and in this country, all the decisions are in accord with *Wood vs. Morewood*, and against the contention of the appellees. *United States vs. Morgan*, 3 *McLean*, 171; *Stockbridge Comp'y*, 102 *Mass.*, 80.; 53 *Penna.*, 261 ; *Foote vs. Merrill*, 54 *N. H.*, 490 ; 23 *California*, 306.

If we turn from the reported cases to the elementary writers on the subject, we find without a single exception they all recognize the broad distinction between a willful trespasser and a *bona fide* claimant. In *Mayne on Damages*, after referring to the rule in *Martin vs. Porter*, the author says :

"It seems however that where there is a *real dispute* the case is different, and in such a case the minerals are to be valued as if the coal-bed in which they lay had been purchased from the plaintiff." *Addison on Torts*, 300.

"In actions for trespass in taking away the plaintiff's coal, he is entitled to recover the value of the coal at the time of its severance, and the trespasser cannot claim any deduction therefrom, in respect of the expense incurred by him in getting the coal *unless there is a real dispute of title* * * * * in which case the jury may give such an amount only as the plaintiff would have obtained from the defendant on a sale of the coal."

The distinction thus recognized is eminently just and proper, and one which lies at the foundation of all actions of trespass in which the elements of malice and bad faith are wanting. And although the rule in the Barton coal case may be applied to a willful trespasser, or where coal is taken inadvertently, which in a legal sense may be construed as negligence, yet where it is mined in good faith under a claim of title, it does seem to me, with great deference to the opinion of the majority of the Court, that there is no reason why the plaintiff should recover not only compensatory damages, but also the increased value of the coal, arising from the labor bestowed upon it in mining and preparing it for market. It is not pretended that the evidence was legally insufficient to prove that the coal was mined in perfect good faith under claim of title, and the Court therefore erred, we think, in granting the plaintiffs' thirteenth, and in refusing the defendant's fifth prayer.

The instructions of the Court in regard to the locations made by the plaintiffs and defendant present, we think, correctly, the law on the subject.

" Joseph's Farm," the land of the appellees on which the trespass is alleged to have been committed, and lot 3825, belonging to the appellant, call for the same beginning, *a chestnut tree marked* " 3689," *standing S 2° W. forty perches from Joseph Warnick's house, and N. 29° E. 300 perches from the beginning of lot 3754.*" The house having disappeared, the appellant undertook to locate the beginning by reversing one of the reference lines of lot 3825. On the other hand the appellees proved by several witnesses on the survey the place where the beginning tree stood. Under these circumstances the Court instructed the jury " they were not at liberty in ascertaining where the said beginning tree originally stood to resort to reversing the reference lines called for in certificate of lot 3825, unless they were satisfied from the testimony in the

cause, that said beginning tree originally stood at the point indicated by the running of the said reference line, or that the true position of said beginning tree had been lost."

In other words, in ascertaining where the beginning tree originally stood, it was the duty of the jury to consider all evidence in the cause relating to that point, and that the reversing of *one of the reference lines* of lot 3825 did not give an imperative call which must be gratified, unless they were satisfied from all the evidence that the beginning tree stood at the point indicated by the running of said reference line, or that the true beginning had been lost.

Nor do we see any objection to the fourth prayer. If the fence located by the appellees on the first and home line of *"Joseph's Farm"* represented the place where the old division fence stood, between the lands of the appellees and those of the appellant. for a period of over fifty years, and that the owners of the land on either side possessed, cleared and cultivated up to said fence and said line, and the said fence and fence line corresponded with the first and home line of Joseph's Farm as located by the appellees, then the jury were at liberty to find from these facts that the first and home line of Joseph's Farm was correctly located by the appellees. We do not think this instruction is liable to the objection urged by the appellants, that it required the jury to find from the facts set forth in the prayer that the first and home line was properly located without regard to all the other evidence in the case as to the boundaries of the several tracts. It merely instructed the jury, that from the facts thus enumerated, they *might* find the home line to have been properly located by the appellees.

It appears the appellants had offered in evidence for illustration plats and certificates of a tract called "Defiance," and of a tract called "Strawberries and Cream" and a patent of "Grave-yard Ridge."

The beginning of Defiance calls for a stone marked " J. S.," standing at the end of the first line of lot 3826,

and about two perches south and west from a graveyard, and running thence south 68° west thirty-two perches to a bounded dogwood sapling. The stone J. S. having disappeared, the appellant and appellees undertook to locate the graveyard, and then by reversing the first line to find the begining of "Defiance." If the graveyard was correctly located by the appellees, and the same as located was about two perches south and west from the beginning of "*Defiance*" as located by the appellees, and if the place located by the appellant as a graveyard never was in fact a graveyard, and the beginning stone "J. S." could not be found, then the jury were at liberty to find from these facts that the beginning of "Defiance" and the end of the first line of lot 3826, were correctly located by the appellees.

As we have before stated, "Joseph's Farm," "Michael's Wonder" and lot 3825 call for the same beginning. Lot 3826 begins at the end of first line of lot 3825, and "Defiance" begins at the end of first line of lot 3826, and the end of the first line of "Defiance" calls for a dogwood tree. Now the appellants located the beginning of lot 3825 and Michael's Wonder, one of the originals of Joseph's Farm, by reversing from the dogwood tree at the end of the first line of Defiance in order to find the beginning of that tract and the end of the first line of 3826, and then by reversing the first line of 3826 to obtain the end of the first line of 3825. Having thus found the end of the first line of lot 3825, if the beginning tree of that tract could not be found, the jury might ascertain the beginning by reversing the first line. But "Defiance" being a younger tract than lot 3826 or "Michael's Wonder," it was proper to instruct them that the point thus located as the beginning of lot 3825, did not necessarily determine the beginning of said lot unless they were satisfied from all the evidence in the cause that "the chestnut tree," called for as the beginning of said lot, stood at the

point where such reversed lines terminated when the original surveys of lot 3825 were made.

And for the same reasons there was no error in granting the eighth prayer in reference to the location of the beginning of lots 3836, 3825 and "Michael's Wonder," made by reversing from the second line of "Strawberries and Cream."

The beginning of "Strawberries and Cream" calls for the end of the fourth line of Graveyard Ridge, and runs thence with part of the fifth line thereof; and the fifth line of Graveyard Ridge calls to end ninety-seven perches on the second line of lot 3826.

In locating "Strawberries and Cream" it was necessary therefore for the appellant to locate the fifth line of Graveyard Ridge, and in locating the fifth line of Graveyard Ridge it was necessary to locate the second line of lot 3826. Unless therefore the second line of said lot was properly located, the locations made by the appellant could not determine any point in the survey. The ninth prayer was therefore properly granted.

The defendant's second and third prayers are based upon the theory that if the land in dispute belonged to Elizabeth McMillan for life, and the mine was opened at the time her life estate began, the plaintiffs being *tenants in remainder*, are not entitled to recover damages for the coal mined by the defendant.

A life tenant, it is true, is entitled to work mines which were open and being worked at the time the life estate began. But in this case the mine was not opened in the sense in which that term is used. There was an opening at the place where the coal cropped out, and the coal had been used for domestic purposes, but it never had been mined for market. Under such circumstances the tenant for life had the right to use the coal only for such purposes as it was used when the life estate began. She had no right to open the mine for the purpose of mining coal

for sale. *Ostrey vs. Ballard, Freeman,* 445 ; *Clavering vs. Clavering,* 2 *P. Wm's,* 388 ; 3 *Keb.,* 709 ; 2 *Mod.,* 193 ; *Viner vs. Vaughan,* 2 *Beav.,* 466 ; *Coke Litt.,* 53 *a,* 54 *b.*

We see no objection to the evidence offered under the first bill of exceptions. The witness had been a boss miner in the employ of the defendant, and as such it was his duty to know the lines and boundaries of the defendant's property ; and one Thomas G. Kerr was the general superintendent of the defendant, in charge of its mines and works. The fact that Kerr at the time pointed out to witness the line between the properties of the plaintiffs and the defendant, and told him not to cut or allow timber to be cut over said line, was admissible in evidence.