STRAWBRIDGE *v.* DAY

No. 40550 November 11, 1957 98 So. 2d 122

*W. S. Turner,* Aberdeen; *Adams, Long & Adams,* Tupelo, for appellant.

*Richard B. Booth,* Aberdeen, for appellee.

KYLE, J.

The appellant, Kirk Strawbridge, as plaintiff, filed a declaration in the Circuit Court of Monroe County against the appellee, Clarence Day, as defendant, seeking to recover actual damages and the statutory penalty for the wrongful cutting of trees on the appellant's lands. The case was tried at the March 1956 term of the court, and the jury was unable to agree on a verdict. A mistrial was entered, and the case was again tried at the October 1956 term of the court. The jury returned a verdict for the plaintiff for the sum of $500. A judgment for that amount was duly entered and the appellant has prosecuted this appeal. The appellee has also filed a cross-assignment of errors.

The appellant's main assignment of error on his direct appeal is that the court erred in refusing to grant the appellant's request for a peremptory instruction directing the jury to return a verdict for the plaintiff for the statutory damages to be calculated on the number of trees shown by the plaintiff's evidence to have been cut. It is therefore necessary that we state briefly the facts alleged in the pleadings, and that we give a brief summary of the evidence offered in support of the allegations made in the plaintiff's declaration and the defensive matters incorporated in the defendant's answer.

The record shows that the declaration was filed on August 19, 1955, and that the appellant was the owner at that time of approximately 210 acres of land in Monroe County described as the S½ of the SE¼, the NE¼ of the SE¼ and 10 acres in the southeast corner of the NW¼ of the SE¼ of Section 31, and the W½ of the SW¼ of Section 32, all in Township 14, Range 17 West. The appellee was the owner of the tract of land lying immediately west of the appellant's 80-acre tract described as the S½ of the SE¼ of Section 31; and the appellee and his

brother were the owners of the tract of land lying immediately east of the appellant's 80-acre tract described as the W½ of the SW¼ of Section 32. The appellant and the appellee were both actively engaged in timber stand improvement practices under the subsidized timber stand improvement program put on by the Production Marketing Association and were being paid government subsidies for improved practices in thinning and culling undesirable trees. The trespasses complained of in the plaintiff's declaration were alleged to have been committed during the latter part of the year 1954 and the early part of the year 1955, when the appellee, who owned extensive tracts of timber lands in Monroe County, was having his lines run out and marked by a surveyor employed by him for that purpose.

The plaintiff alleged in his declaration that the defendant had trespassed willfully over the west line of the plaintiff's land in Section 31 and over the east line of the plaintiff's land in Section 32, and had "cut and deadened and damaged a large number of trees and bushes and saplings, totaling 992," that 430 such trees had been cut or damaged along the west property line and 562 such trees had been cut or damaged or deadened along the east property line; and that the defendant had become liable "not only for the actual market value of the trees damaged, cut and deadened, but also for the statutory penalty." The plaintiff asked for a judgment for the sum of $6,000 actual and punitive damages. In a bill of particulars filed later the plaintiff stated that his deeds described the lands referred to by governmental subdivisions, but the plaintiff claimed title by adverse possession to all land lying east of a fence which extended north and south along the west side of the plaintiff's 80-acre tract described as the S½ of the SE¼ of Section 31, and all land lying west of a line marked by hacked trees along the east side of the plaintiff's 80-acre tract described as the W½ of the SW¼ of Section 32, regardless

of whether the fence line and the hacked tree line were on the true lines according to the government surveys or not.

In his answer the defendant denied the material allegations of the plaintiff's declaration and the above mentioned bill of particulars, and the defendant specifically denied that either he or his agents or employees had willfully or knowingly trespassed upon any of the lands of the plaintiff. As an affirmative defense to the plaintiff's demand for the statutory penalty the defendant averred that the lands owned by the respective parties were in the hilly section of Monroe County and were not in cultivation; that defendant's lands which abutted on the plaintiff's lands were described in the deeds by governmental subdivisions, and the defendant had employed one Olen M. Smith, a qualified surveyor to run the lines and establish the true location thereof; that the lines were run out by the surveyor and marked on the ground before any objection was made by the plaintiff; that no marketable timber had been cut in running the lines; and that all of the acts of the defendant, and his agents and employees, complained of in the plaintiff's declaration had been done in good faith; and that neither the defendant nor his agents or employees had knowingly cut any trees on the plaintiff's lands.

Kirk Strawbridge testified that he had purchased the 80-acre tract of land described as the S½ of the SE¼ of Section 31 from E. S. Formby and his wife in 1938, and that there was a net wire fence along the west side of the 80-acre tract at that time, which H. K. Williams, who owned the land lying immediately west of the 80-acre tract, pointed out to him as the division line between them. Strawbridge stated that the fence was something like a garden fence. He would not say that the fence was a straight fence, but he did say, "That's what I used for my line." Strawbridge stated that he had purchased the 80-acre tract of land described as the W½

of the SW¼ of Section 32 from E. L. Pennington and Cora Lee Pennington in 1944; that there was no fence along the east side of that 80-acre tract; but there was a hacked line through there, which he had seen a number of times. He could not say whether the hacked line was a straight line or not, but there had never been any controversy about the location of the line between him and C. C. Day, the defendant's father, who owned the east half of the quarter section prior to his death in 1954. Strawbridge stated that the county surveyor had run the line between the east half and the west half of the quarter section several years before the death of C. C. Day, so that Day's workmen might cut the timber on the 80-acre tract which Day owned, that he was present when the line was run, and that the surveyor started at "a pine knot up there."

Strawbridge stated that he was living at Amory at the time of the trial, and that he knew nothing about the defendant's trespassing on his lands until the latter part of December 1954, when he walked over his lands and saw that the defendant's workmen had cut a line 4 to 6 feet wide across the west side of the 40-acre tract in Section 31 which adjoined the defendant's land in that section. He saw colored workmen running a machine and poisoning undergrowth on the defendant's land lying immediately west of the net wire fence. He told them not to cross the net wire fence, and if they did they would have trouble. He called the defendant's woods foreman on the telephone a few days later and told him not to cross over and deaden any timber on his land. About a week later he went back "to see if they had gone over, " and he found that they had, and that they had painted a line on each side of the right of way line. The line that had been cut was about 51 feet over on the inside of the fence at the north end and about 6 feet over at the south end. Strawbridge stated that sometime later, during the month of February, he learned that the defendant's workmen had cut a line

from 5 to 6 feet wide along the east side of the 80-acre tract that he owned in Section 32 and in doing so had encroached over the hacked tree line about 30 feet. Strawbridge stated that he did not charge Mr. Day with cutting and removing any merchantable timber, but some trees which were marketable were poisoned. He was asked what his best estimate was as to the damage that had been done to his merchantable timber on his lands on account of the alleged trespasses complained of in his declaration. His answer was, "Like it was, I would say $250." He stated that he figured that was what it would cost to put it back in the stage it was in, "To put it back like it was before he went in there."

On cross-examination Strawbridge stated that he had participated in the timber stand improvement program put on by the Production Marketing Association, and that the government had paid him $2.50 per acre for the deadening and grubbing that he had done on the east 40-acre tract north of the road. The program consisted of eliminating diseased trees, the undesirable trees, so that the trees that were left could grow into timber.

Tom Honeycutt testified that he and Joe Williams counted the trees which had been cut along the lines marked out by the surveyor. Mr. Strawbridge showed them where the lines were. Williams counted the trees that were over 4 inches in diameter, and Honeycutt counted the trees that were under 4 inches in diameter. On the east side he and Williams went by some old marked trees. Honeycutt stated on cross-examination that he counted every thing in the survey line, counted the stumps. Some were pretty small. He counted plenty the size of a coca cola bottle. the trees that he counted ranged from the size of a top of a drinking glass to the size of the top of a coca cola bottle.

Several other witnesses testified for the plaintiff concerning the net wire fence which Strawbridge claimed as the west line of his land in Section 31. Jim Boyd testified

that the fence had been erected about 40 years before the trial by Jim Howell who owned the Strawbridge west 40-acre tract at that time. Boyd owned the 40-acre tract lying immediately west of Howell, and Boyd stated that Howell erected the fence, so that he could pasture his hogs. Boyd and Howell never had the line run by a surveyor, but they took the fence as the line between them. Henry Anglin testified that the fence was put up as a line fence, and was "about as straight as you usually see a fence put up." Anglin was asked whether Strawbridge's land was marked down the east side. His answer was, "Yes, me and Jim Boyd cut some heading timber back a number of years ago, and there was some marks on some trees we went by." He stated that he sold his land over there to Mr. C. C. Day, the defendant's father, but he did not show Mr. Day the hacked line. He stated that he never had his line surveyd to see whether the hacked trees that he had mentioned were on the line—"No, just sort of guessed at it, * * * and I reckoned all were satisfied with the line." J. F. Cox testified that he had served as county surveyor, and that he had surveyed the east line of land owned by Strawbridge in Section 32 about fifteen years before the date of the trial. C. C. Day owned the land east of the line at that time, and Mr. Day's foreman brought three hands from the mill to cut the right of way. Cox stated that he started "at a pine knot corner over there east of the road" and went south.

The appellant, C. C. Day, testified that he had purchased the land on the west side described as the S½ of the SW¼ of Section 31, which adjoined the Strawbridge land on the west side, from George S. Chance in 1951, and that he and his brother had inherited the land on the east side of the Strawbridge land from their father in 1954. He stated that he and his brother were engaged in the business of growing timber, and that they had participated in the government timber stand im-

provement program. He stated that the lands which they owned and the Strawbridge lands were described in the deeds according to the government surveys, and that he employed a surveyor in 1953 to run the lines and mark out the boundaries. He gave the surveyor a description of the lands and told him to run the lines to the best of his ability, and he depended upon the surveyor to do that. The lines were run during the year 1953 or 1954 and neither Mr. Strawbridge nor any one else told him at that time that Mr. Strawbridge claimed title to land on the west side to a fence, or on the east side to a hacked line. He stated that during the latter part of the year 1954 he had his foreman, M. E. Thompson, put a crew of workmen on his land west of the Strawbridge land in Section 31 to girdle and poison the culled timber up to the line which the surveyor had marked out. That was about Christmas time. A few days later Thompson told him that Mr. Strawbridge had objected to the line that had been run on the west side. He understood that the complaint that Strawbridge had made to Thompson related to the west line only, and sometime during the month of February he had timber stand improvement work done on his land adjoining Strawbridge on the east side.

Day stated that neither he nor any of his employees had ever willfully trespassed on the land owned by Mr. Strawbridge. He stated that sometime after the suit was filed and before the date of the trial he went on the lands to make a personal inspection of the lines run by the surveyor and the old fence and hack marks referred to in the plaintiff's declaration. Mercer Nichols, D. L. Williams, C. N. Dale, Jr., and Johnnie Atkins went with him. He and his companions walked the entire east line between the Strawbridge land and his own land in Section 32, as run out and marked by the surveyor. The path cut through by the surveyor was 3 or 4 feet wide. He observed some old hack marks along the east line, which followed very nearly the line run out by his surveyor. The

hack marks were sometimes on one side of the line run by the surveyor and sometimes on the other. At the north end of the line there was a pine knot. The line run by his surveyor hit the pine knot. Day stated that he also walked the west line and observed the old hog wire fence, which was down in places. It was not a straight fence, and was not any set distance from a straight line. He saw no trees, saplings or any bushes of any value that had been cut on the surveyed lines. He saw no timber of any value that had been girdled on either side of the lines. The trees that had been girdled were culled trees, of no merchantable value. He admitted that his workmen had girdled and poisoned the culled timber up to the lines run by the surveyor.

Mercer Nichols, a sawmill operator who lived at Aberdeen, testified that he accompanied Mr. Day when he inspected the new lines which had been run out and marked by the surveyor. There had been some timber deadened, not any cut, and the timber that had been deadened was not of any value. The path cut through by the surveyor on the east side was very narrow, and there was no timber cut and no damage done along the west line by cutting of trees. The old hog wire fence on the west line appeared to have been there a good many years. It was close to the line on the south end, and on the north a little farther off. It was a zigzag fence. He stated that he observed a few hacked trees along the east line. The new line was sometimes on one side of the hacked trees and sometimes on the other, and there was a pine knot there for a corner stob. The new line ran into the pine knot. D. L. Williams, a state forester, and Johnnie Adkins and C. N. Dale, Jr., corroborated the statements made by Mercer Nichols.

The case was submitted to the jury on the question of the liability of the defendant for actual damages for the alleged trespass, and also on the question of liability for the statutory penalty.

The first point argued by the appellant's attorneys as ground for reversal of the judgment of the lower court, as indicated above, is that the court erred in refusing to grant the appellant's request for a peremptory instruction directing the jury to return a verdict for the plaintiff for the statutory damages, as well as actual damages. And in support of their contention that the court should have directed a verdict for the statutory penalty, the appellant's attorneys say: "To turn the surveyor aloose without instructions and without benefit of defendant's knowledge (actual or imputed) of existing boundaries was gross negligence."

But we think there was no error in the court's refusal to grant the instruction.

The plaintiff's action was based upon Section 1075, Mississippi Code of 1942, as amended by Section 2 of Chapter 312, Laws of 1950. The statute as amended defines in the language of the statute prior to the adoption of the amendment the owner's right of action to recover the statutory penalty and the actual value of trees wrongfully cut down, damaged or destroyed. But under the amended statute, the plaintiff, in order to establish his right prima facie to recover such statutory penalty and the actual value of the trees, is no longer required to show by a preponderance of the evidence that the defendant, or his agents or employees, acting under the command or consent of their principal, willfully, recklessly and knowingly cut the trees. The plaintiff is only required to show that the timber belonged to him, and that the timber was cut by the defendant, his agents or employees, without his consent. Reynolds v. McGehee, 220 Miss. 750, 71 So. 2d 780. But, by the terms of the amendment, the defendant may establish good faith as an affirmative defense to the plaintiff's claim for the statutory penalty.

The phrase "good faith", as used in a statute such as we have here, denotes honesty of purpose, free-

dom from intention to defraud or to deprive others of rights or property to which in equity and good conscience they are entitled. ■ ■ In order to avoid liability for the statutory penalty in a case of this kind the defendant is not required to prove freedom from negligence, but only that the trespass was not willful, or did not result from wantonness or recklessness. As stated by the Court in Dartmouth College v. International Paper Co., 132 Fed. 92, which was an action of trover for the conversion of timber cut and removed by the defendant from the plaintiff's land, "The good faith which will protect the defendant is not incompatible with some degree of negligence. Almost any trespass upon the rights of another which is not willful arises, in whole or in part, from the defendant's ignorance of something which he might have discovered had he exercised a certain degree of care. 'Trespasses on the land of another, not willful, always imply some degree of negligence.' Franklin Coal Co. v. McMillan, 49 Md. 549, 559, 33 Am. Rep. 280.''

In Leavenworth & Son, Inc., v. Hunter, 150 Miss. 245, 116 So. 593, this Court held that in a suit for both the statutory penalty and the actual value of timber cut from lands belonging to the plaintiff, where it appears that the defendant acted in good faith, under the belief that the timber cut was on lands purchased by him from another source, the statutory penalty is not allowable, but only the actual value of the timber so taken is recoverable. See also E. L. Bruce Co. v. Edwards, 192 Miss. 1, 3 So. 2d 846, and Anderson-Tully Co. et al. v. Campbell et al., 193 Miss. 790, 10 So. 2d 445.

■ ■ The defendant in the case that we have here testified as a witness in his own behalf to establish good faith as a defense to the plaintiff's claim for the statutory penalty. The defendant stated that both he and Strawbridge were participating in the government timber stand improvement program; that the lands which he and his brother owned and the lands which Strawbridge owned

were described in their deeds as legal subdivisions of sections shown on the township plats, and that he had employed a surveyor to run the boundary lines of the lands which he and his brother owned so as to establish the true location thereof according to the deeds under which they held title; that he had no knowledge at that time that the plaintiff claimed title by adverse possession to any land lying outside the calls of his own deeds or embraced within the calls of the defendant's deeds; and that the only complaint he had ever received about the alleged trespasses prior to the filing of the plaintiff's declaration was the complaint which the plaintiff made to Thompson, the woods foreman, after he saw colored workmen running a machine and poisoning undergrowth on the defendant's land lying immediately west of the net wire fence, sometime during the latter part of December, and that complaint, he understood, related only to Strawbridge's west line. Day's testimony as to his own good faith in the matter was not contradicted, and Strawbridge admitted that no merchantable timber had been cut. With that testimony in the record we think the plaintiff's request for a peremptory instruction to the jury to find for the plaintiff on the issue of the statutory penalty was properly refused.

But, it is argued that there is proof in the record to show that the defendant's employees went back on the plaintiff's land and committed other trespasses after the plaintiff had issued his warning to the defendant's woods foreman not to cross over and deaden any timber on his land, and that the plaintiff was at least entitled to the statutory penalty for the trees that were cut or deadened after the plaintiff had issued his warning. It is true that Strawbridge testified that about a week after he had issued his warning he went back to see if Day's workmen had crossed over his wire fence, and he found that they had crossed over the fence and had painted a line on each side of the right of way and had poisoned the trees be-

tween the line and the fence. But Strawbridge did not undertake to say, and there is no proof in the record to show, how many trees, if any, had been poisoned after the warning was issued, or what kind of trees they were; and in the absence of such proof the jury would have been unable to render an intelligent verdict for statutory damages for the poisoning of the trees referred to, if they had been instructed to do so. As to the trees that were cut, deadened and poisoned along the east line during the month of February, the jury had a right to believe from the evidence that the line run out and established by Day's surveyor conformed substantially to the hack marks left by former surveyors, and that the trees which had been cut, deadened and poisoned by Day's workmen along the east line during the month of February were on Day's own land.

 It is next argued that the court erred in refusing to grant the plaintiff a new trial on the question of damages alone. But we think there is no merit in this contention. The plaintiff himself testified that no merchantable timber had been cut or removed by the defendant and the plaintiff's own estimate as to the damage that had been done to his merchantable timber on account of the alleged trespasses was $250. That amount was the amount which the plaintiff estimated it would take "to put it back like it was before he went in there."

 The remaining assignments of error on the plaintiff's direct appeal relate to the refusal of the court to permit the plaintiff to amend his declaration so as to charge other trespasses committed several months after the filing of the plaintiff's declaration, and the court's action in excluding testimony relating to such alleged subsequent trespasses. But we think there was no error in the court's refusal to permit the plaintiff to amend his declaration so as to incorporate in it the additional charges set forth in the proposed amendment, or in the court's action in excluding the testimony relating to

such additional charges. The subsequent trespasses were alleged to have been committed in June, 1956, approximately a year and a half after the commission of the trespasses complained of in the declaration. The amendment, if allowed, would have injected into the trial new issues of fact wholly unrelated to the charges made in the declaration which the defendant had been called upon to answer, and testimony relating to the later trespasses would have shed no light upon the defendant's actions at the time of the commission of the trespasses complained of in the declaration.

The appellee has filed a cross-assignment of errors, in which he alleges that the court erred in refusing his request for à peremptory instruction at the conclusion of all of the evidence and in overruling the appellee's motion for a new trial. In support of the first cross-assignment of error, it is argued that there was no proof that the plaintiff had suffered any actual damages as a result of the trespasses complained of and no proof of willfulness on the part of the defendant, and that the court should have directed a verdict for the defendant on the issue as to actual damages and on the issue as to punitive damages. But we think there was sufficient proof in the record to warrant a finding by the jury that trespasses had been committed by the defendant's agents and employees on the strip of land on the west side of the 80-acre tract in Section 31, lying alongside the hog wire fence, and that the plaintiff was entitled to recover such actual damages as he may have sustained as a result of those trespasses, and that there was no error in the court's refusal to grant the peremptory instruction requested by the defendant. As to the second cross-assignment of error, the defendant did not ask for a new trial on the ground that the verdict was excessive, and there was no error in the court's refusal to grant a new trial on the grounds stated in the motion.

We find no error in the record that would justify a reversal of the judgment either on direct appeal or cross appeal, and the judgment of the lower court is therefore affirmed.

Affirmed on direct appeal and on cross appeal.

*Roberds, P. J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.