# PINE RIVER LOGGING COMPANY *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 250. Argued May 1, 2, 1902.—Decided June 2, 1902.

By an act of Congress of February 16, 1889, the President was authorized to allow Indians residing on reservations to cut and dispose of dead timber, standing or fallen, on such reservations, for the sole benefit of such Indians. Defendants made five different contracts with individual Indians for the cutting of an aggregate of 2,750,000 feet. As a matter of fact, they cut and removed 17,000,000 feet. *Held:* That as to such excess both the Indians and the defendants were trespassers.

The objection that the several defendants were not responsible for the acts of each other is one which should be taken at the trial, and if not so taken, cannot be made available upon writ of error from this court.

In designating the number of feet to be cut under certain contracts, the use of the words "about" or "more or less" will not justify the cutting of a quantity materially and designedly greater than the amount provided for in the contract.

The fact that the parties themselves disregarded the amount stipulated in the contract, and the further fact that the agent of the Indian Department, who personally directed what timber should be cut and supervised such cutting, assented to their construction of the contract, is no excuse for a material departure from the terms of a contract, which had been approved by the Commissioner of Indian Affairs, acting under the authority and regulations of the President.

With the contracts before them, the agents of the government had but one duty, and that was to see that they were honestly and faithfully carried out according to their spirit and letter.

Damages were properly assessed at the value of the logs as they were banked upon the streams and lakes near where they were cut.

Defendants being either wilful trespassers, or purchasers from such trespassers, were held not to be entitled to credit for the labor expended upon the timber, but were liable for its full value when seized, although if the trespass had been the result of inadvertence or mistake, and the wrong was not intentional, the stumpage value of the timber when first cut would be the proper measure of damages.

The defendants were held not to be entitled to credit for a percentage of the stipulated compensation paid to the Indian Department as trustee for the benefit of helpless Indians.

In civil cases the United States recover the same costs as if they were a private individual.

The reporter's fee for a transcript of the record used by the plaintiff in preparing its bill of exceptions on appeal should not be taxed as costs.

THIS was an action in the nature of trover begun in the Circuit Court for the District of Minnesota by the United States against the Pine River Logging and Improvement Company, a corporation, (hereinafter called The Logging Company,) Joel B. Bassett and William L. Bassett, copartners under the name of J. B. Bassett & Co., and John L. Pillsbury (for whom his administrators have since been substituted) and Charles A. Smith, copartners as C. A. Smith & Co., defendants, to recover damages for an alleged wrongful entry by the defendants upon an Indian reservation, and the cutting and removing of certain pine timber thereon.

The complaint, which contains nine counts, charges in substance that nine different parties did, with the consent and at the request of defendants, wrongfully enter upon certain lands of the United States known as the Mississippi Indian Reservation, and at the special instance and request of the defendants fell and cut into logs certain pine trees, which they

delivered to the defendants, who thereupon caused the logs to be floated down the river to the city of Minneapolis, to be there manufactured into lumber, which they had subsequently sold and appropriated the proceeds thereof to their own use.

The answers filed by the defendants, The Logging Company and the Bassetts allege in substance the following facts: That the logs referred to were cut under and by virtue of certain contracts which had been entered into with individual Chippewa Indians for the cutting of dead and down timber found on the reservation; that said contracts had been executed in pursuance of an act of Congress, approved February 16, 1889, 25 Stat. 673, in relation to the cutting of timber on Indian lands; that payment for the logs so cut and removed had been made in full to the United States, and to the proper Indian agent, in accordance with the provisions of said contracts; that said logs were so cut by the Indians and delivered to and accepted by the defendants in good faith, in the honest belief that said logs had been lawfully cut under their contracts from dead and down timber, and that defendants were entitled to the same and became owners thereof upon the delivery of the logs and upon making the aforesaid payments; that after the logs had been delivered to the defendants and before they were floated down the river to Minneapolis, the United States, through its proper officer, had seized and taken possession of the logs, claiming that they were cut from green and growing timber and not from dead and down timber; that thereafter, for the purpose of preserving said logs and realizing their full value for the party who should ultimately be determined to be the owner, a contract was entered into between the United States on the one hand and The Logging Company and J. B. Bassett on the other, which provided in substance that the defendants might drive the logs to Minneapolis without affecting the possession of the United States or the interest of any of the parties in the logs, and that after they had been driven to Minneapolis the defendants executed and delivered to the plaintiff a bond conditioned to pay any judgment that might be rendered against the defendants by the United States on account of the cutting of their logs. One of these bonds was executed by The Logging Com-

pany as principal, and the other by the firm of J. B. Bassett &
Co.   It was next set up in the answer of The Logging Company
that the United States had accepted the bond in lieu of the logs,
and that, relying upon said acts of the complainant, The Log-
ging Company had disposed of the logs to others.   It was then
again specifically set up in the answer, as to the fourth, seventh
and eighth counts of the complaint, that the claim of the
United States was solely against J. B. Bassett & Co., and not
against The Logging Company; that the claim set up in the
first, second, third, fifth and sixth counts was solely against The
Logging Company, and that there was therefore a misjoinder
of causes of action in improperly uniting in one complaint causes
affecting solely The Logging Company and other causes of
action affecting solely the firm of J. B. Bassett & Co.

A separate answer was filed by the firm of C. A. Smith &
Co., who admitted receiving from The Logging Company a cer-
tain amount of the pine saw logs described in the complaint,
and that they manufactured the same into lumber, and disposed
of it in the ordinary course of their business; that the amount
of the lumber so manufactured was 15,628 feet, and that the
value of the same was not greater than the sum of $132.84; that
the defendants in receiving and manufacturing said logs honestly
believed that The Logging Company was the owner and en-
titled to dispose of them.   They also pleaded a misjoinder and
non-liability for the acts of the other defendants.

The answer of The Logging Company admitted in substance
that, under and by virtue of the three contracts between itself
and the Indians, it had received into its possession, converted
into lumber, and ultimately sold pine saw logs, cut upon Indian
reservations, which had yielded in the aggregate 13,463,400
feet.   The defendants, J. B. Bassett & Co., likewise admitted
that under two contracts with the Indians they had received
saw logs which had yielded in the aggregate 4,136,860 feet of
lumber.

The United States demurred to parts of these answers, and
replied to other parts, admitting that The Logging Company
and Bassett & Co. had each entered into contracts with certain
Indians, but averred that all the logs cut under some of the

contracts and a large portion of the logs cut under other contracts were cut from pine trees that were alive and standing, while the contracts authorized only the cutting of dead and down timber.

The case being at issue upon these pleadings, The Logging Company and Bassett & Co. moved for a judgment against the government upon the pleadings for the sole reason, as stated in the motion, that on the facts admitted the plaintiff was not entitled to maintain an action of trover or conversion against these defendants, or either of them, for the matters and things set out in said cause of action; but that the remedy of the government was upon the bonds given when the logs were surrendered to the defendants. This motion was sustained by the Circuit Court and a judgment entered against the United States, which, however, was reversed by the Court of Appeals, holding that neither of the bonds became available to the United States until a judgment had been obtained in its favor. The case was remanded for a new trial. 78 Fed. Rep. 319.

Upon the case being sent back to the Circuit Court there was a second trial, which also resulted in a judgment in favor of the defendants. The Court of Appeals reversed this judgment upon exceptions taken by the United States at the trial. 89 Fed. Rep. 907.

A third trial of the case resulted in a verdict, by direction of the court, in favor of the United States for $88,269.94. This judgment was affirmed by the Circuit Court of Appeals. Whereupon a writ of error was sued out from this court.

*Mr. A. S. Worthington* for plaintiffs in error.

*Mr. John E. Stryker* for the United States. *Mr. Robert A. Howard* and *Mr. Solicitor General Richards* were on his brief.

MR. JUSTICE BROWN delivered the opinion of the court.

This case was tried before a jury upon the theory that the defendants went far beyond the terms of their contracts with the Indians, and cut not only a large excess in quantity, but

selected a quality of timber wholly unauthorized by the contracts, or by the acts of Congress, or the regulations of the President in connection therewith. The questions to be considered arise upon objections to the testimony and the instruction of the court to the jury to return a verdict for the plaintiffs.

It is conceded that the fee to the lands comprised within Indian reservations is in the United States, subject to a right of occupancy on the part of the Indians, and that the unauthorized cutting of timber upon Indian reservations is not only unlawful, *United States* v. *Cook*, 19 Wall. 591; *Northern Pacific Railroad* v. *Lewis*, 162 U. S. 366, but is made a criminal offence by the act of June 4, 1888. 25 Stat. 166. But by an act of Congress passed February 16, 1889, 25 Stat. 673, it is provided: "That the President of the United States may from year to year in his discretion, under such regulations as he may prescribe, authorize the Indians residing on reservations or allotments, the fee to which remains in the United States, to fell, cut, remove, sell or otherwise dispose of the dead timber standing or fallen, on such reservation or allotment, for the sole benefit of such Indian or Indians. But whenever there is reasonable cause to believe that such timber has been killed, burned, girdled or otherwise injured for the purpose of securing its sale under this act, then in that case such authority shall not be granted."

It will be observed that by this statute no general authority is given to Indians to cut timber upon their reservations. The act contemplates that the authority shall be temporary only, "from year to year," and it is further limited to "dead timber standing or fallen," and that it shall be disposed of solely for the benefit of the Indian or Indians to whom the authority is given.

Pursuant to this act certain regulations were prepared by the Secretary of the Interior, approved by the President, and extended to the Indians of the Chippewa reservation in the State of Minnesota. These regulations provided that each Indian who engaged in the work should provide his own logging outfit and supplies; that no Indian should be allowed to log who has children of school age, but not attending school, unless in

the opinion of his agent some good reason existed in special cases which were sufficient to exempt particular persons from this requirement; otherwise, every Indian on the reservation, not well employed, should be permitted and encouraged to engage in the work; that all cutting should be done under the superintendence and direction of a competent white man, who should go into the woods with the Indians, "to the end that no green or growing timber may be cut, and that no live trees are damaged in any manner, so as to cause them to die;
and to inspect the scaling of the logs;" that with the exception of a superintendent and of foremen and blacksmiths, all white labor was to be excluded from the reservation; that the logs cut should be sold at public sale to the highest bidder, either by auction or by calling for sealed proposals, at the discretion of the Secretary of the Interior, after at least two weeks' notice by publication in the newspapers, and no sale of the logs should be valid until approved by the Commissioner of Indian Affairs; and that ten per cent of the gross proceeds derived from such sale of the logs should go to the stumpage or poor fund of the tribe, from which the old, sick and otherwise helpless might be supported.

The timber in this case was cut under five different contracts made between individual Indians and the defendants, all of which were limited to dead and down timber, to be cut during the season of 1891 and 1892. The first provided for 250,000 feet; the second for 500,000 feet; the third for 500,000 feet; the fourth for 1,000,000 feet, and the fifth for 500,000 feet. The whole amounted to 2,750,000 feet. These contracts were approved by the Commissioner of Indian Affairs, and, although in some of their provisions, they differed from the general regulations above stated, which provided for a public sale of logs at auction or under sealed proposals, they must be regarded as superseding those regulations in that particular, and as constituting new regulations approved by the President and Commissioner of Indian Affairs.

The object of the statute, as interpreted by these regulations, was evidently to permit deserving Indians, who had no other sufficient means of support, to cut for a single season a limited

quantity of dead and down timber under the superintendence of a properly qualified white man, and to use the proceeds for their support in exact proportion to the scale of logs banked by each, provided that ten per cent of the gross proceeds should go to the stumpage or poor fund of the tribe, from which the old, sick and otherwise helpless might be supported. The rights of the government to the unimpaired value of the land and to the standing timber were carefully guarded by the proviso that no green or growing timber should be cut, and no live trees damaged, so as to cause them to die, that they might be marketed under the provisions of the act. Nothing can be plainer than that there was no intention on the part of Congress or the President to authorize promiscuous logging operations, or the felling of live standing timber, or that a few Indians should be permitted to monopolize the proceeds, but that they should be divided among the individuals of the tribe in proportion to the scale of the logs banked by each

1. The first assignment of error takes exception to the action of the Circuit Court in instructing the jury to return a verdict for the United States, because it required The Logging Company to become responsible for, and pay the obligations of, Bassett & Co., and required that firm to pay the obligations of The Logging Company, and also required the firm of C. A. Smith & Co. to pay the obligations both of The Logging Company and Bassett & Co., when there was no evidence in the case to justify the court in holding any of the parties liable for the obligations of the others; or if such evidence existed at all, it was a question of fact for the jury.

The difficulty with this assignment is, that no such point appears to have been taken upon the trial of the case in the Circuit Court. The bill of exceptions shows that when the plaintiff rested, defendants moved the court that the plaintiff "elect as to the time and place of the conversation (conversion) upon which it relies," and that plaintiff thereupon elected to take the value of the logs in the spring of 1892 as they were at the time of the seizure. Upon the conclusion of the entire testimony plaintiff moved the court to strike out all the evidence offered by the defendants with reference to their good faith in the trans-

actions, which the court denied, and plaintiff excepted; and thereupon the court instructed the jury to return its verdict in favor of the plaintiff, to which an exception was also taken. No such objection upon the ground of misjoinder was taken in the assignment of errors filed in the Circuit Court of Appeals to review that judgment, or in the original assignment of errors filed in this court and incorporated in the record. It would appear that the objection was made on behalf of the defendants in the first trial of the case, inasmuch as it is mentioned in the first opinion of the Circuit Court of Appeals. 78 Fed. Rep. 320. It will be remembered that upon this first trial the case was submitted upon the pleadings alone, defendants taking an objection in the nature of a demurrer that, upon the facts admitted by the pleadings, the government could not recover, but was relegated to an action upon the bonds given when the logs were surrendered to the defendants. The Circuit Court of Appeals held that the complaint did not disclose a misjoinder of causes of action, and also that the judgment rendered by the Circuit Court was in such form that, if sustained, it would bar a subsequent suit against either of the defendants for a wrongful conversion of the property. The point was therefore held not to be well taken, and from that time seems to have been waived or abandoned, as it does not appear to have been raised upon the second or third trials.

This clearly precludes the defendants from raising the question at this stage of the case. It is well settled in this court that an objection that the evidence does not support a joint action against all of the defendants—in other words, a variance betweeen the pleadings and proofs—is one which should be taken at the trial, and cannot be raised for the first time in the appellate court. In *Roberts* v. *Graham,* 6 Wall. 578, it was said that an objection of variance between the allegations and proofs must be taken when the evidence is offered, and will not even be available upon motion for new trial. See also *O'Reilly* v. *Campbell,* 116 U. S. 418; *Patrick* v. *Graham,* 132 U. S. 627; *Boston & Albany R. R. Co.* v. *O'Reilly,* 158 U. S. 334.

But, in addition to this, the record is by no means barren of evidence of a joint responsibility. While the contracts with the

Indians were separately made by each defendant, and their accounts of logs cut and money paid were kept distinct from each other, and each averred that it had nothing to do with the contracts of the other, two of the defendants testified that the logs cut under the five contracts were equally divided between C. A. Smith & Co. and J. B. Bassett & Co., and not according to the amounts named in the contracts; that The Logging Company was practically controlled by C. A. Smith & Co., and that the logging operations were conducted under the supervision of three men who were acting as agents of these firms. We do not undertake to say that there was not evidence upon this point which, if the attention of the court had been called to it, should not have been submitted to the jury; but as the question was not made in the Circuit Court or in the Court of Appeals it is too late to raise it upon a writ of error from this court.

2. By the second assignment it is insisted that the court should either have instructed the jury, or left to them to determine, that under the contracts between The Logging Company and Bassett & Co. respectively on the one hand, and the Indians on the other, as those contracts had been construed and acted upon by all parties in interest, including the United States, these companies respectively had a good title to all the dead and down timber delivered to them by the Indians under the contracts, without regard to the specific quantity of timber mentioned therein.

In two of the contracts the designation of the quantity of timber to be cut is preceded by the word "about," and in the other three is followed by the words "more or less." It is contended that by the use of these words the contracts were susceptible of a wide latitude of construction, and if the parties themselves disregarded the limitations, the court, in interpreting those contracts, will adopt the construction given them by the parties interested.

There is no doubt whatever of the general proposition that where the words "about" or "more or less" are used as estimates of an otherwise designated quantity, and the object of the parties is the sale or purchase of a particular lot, as a pile of

wood or coal, or the cargo of a particular ship, or a certain parcel of land, the words "more or less," used in connection with the estimated quantity, are susceptible of a broad construction, and the contract would be interpreted as applying to the particular lot or parcel, provided it be sufficiently otherwise identified. This doctrine is well illustrated in the case of *Brawley* v. *United States*, 96 U. S. 168, where the contract was to deliver to a military post 880 cords of wood, "more or less, as shall be determined to be necessary by the post commander, for the regular supply, in accordance with army regulations and the troops and employés of the garrison of said post." It was held that the latter were the determinative words of the contract, and the quantity, designated at 880 cords, was to be regarded merely as an estimate of what the officer making the contract at the time might suppose would be required; and that the government was not liable for more than forty cords of wood which was accepted by the officers. So in *Watts* v. *Camors*, 115 U. S. 353, it was held that where a ship was described in a charter party as of the burden of 1100 tons, "or thereabouts," registered measurement, the charterer was bound to accept her, although her registered measurement, unknown to both parties, was 1203 tons.

But, upon the other hand, if the agreement be to manufacture, furnish or deliver certain property not then in existence, or to be taken from a larger quantity, the addition of the words "more or less" will be given a narrow construction, and held to apply only to such accidental or immaterial variations in quantity as would naturally occur in connection with such a transaction. *Norrington* v. *Wright*, 115 U. S. 188.

The contracts in this case unquestionably belong to the latter class. They were contracts to cut and deliver a certain quantity of dead and down timber, and if construed, as is claimed, to authorize the cutting of six times that amount, the quantity might as well have been omitted altogether. The argument of the defendants in that connection is virtually an insistence that the specification of the quantity to be cut should be discarded, and as the payment was stipulated at a certain price per thousand feet, the contract should be interpreted as

authorizing the cutting of an unlimited quantity, so long as the price paid was that stipulated in the contract.

Defendants' main reliance, however, is upon the construction of these contracts by the parties themselves, including the United States, and in support of their position they invoke the general rule that where both parties to a contract have by their subsequent conduct given it a construction different from what the law might have given it, the courts will adopt that construction; and that the statutes under which the cutting was done, the correspondence between the Secretary of the Interior, and the President upon the subject, the regulations which the latter adopted for carrying the act into effect, and the conduct of the parties to the contracts, tend to show that they were intended to authorize the removal of all the dead and down timber on the public land described in them. Undoubtedly there is some support for the proposition in the disregard by the parties to the contract of the limitations of quantity to be cut; but upon the statute and regulations we put, as before stated, an entirely different interpretation. The argument overlooks the fact that the Indians had no right to the timber upon this land other than to provide themselves with the necessary wood for their individual use, or to improve their land, *United States* v. *Cook*, 19 Wall. 591, except so far as Congress chose to extend such right; that they had no right even to contract for the cutting of dead and down timber, unless such contracts were approved by the Commissioner of Indian Affairs; that the Indians in fact were not treated as *sui juris*, but every movement made by them, either in the execution or the performance of the contract, was subject to government supervision for the express purpose of securing the latter against the abuse of the right given by the statute. It is true that, as a matter of fact, the work was done under these contracts under the superintendence of a government agent, who personally directed what timber should be cut, and when the timber had been cut and a final settlement was made with the Indians, the amounts found to be due them were paid to the Indian agent, who, with the contracts before him, must have known when he received his payments the quantity of timber which had been cut under the different contracts.

It is unnecessary to inquire what excuses may be made by these officers for thus indirectly approving the construction put upon the contracts by the parties interested, since they could not bind the government in this particular. With the contracts before them they had but one duty, and that was to see that they were honestly and faithfully carried out according to their spirit and letter. No authority had been given them to extend the contracts either as to the quantity or quality of timber to be cut. In fact, they were placed in charge of the operations for the express purpose of seeing that there should be no violation of the contracts in these particulars. They, as well as the parties thereto, were equally bound by its provisions. No discretion had been given them to waive or alter the contracts in any particular. No conduct of theirs can estop the government from asserting its rights to recover for timber cut beyond the quantity and quality specified in the contract. *Lee* v. *Monroe,* 7 Cranch, 366; *The Floyd Acceptances,* 7 Wall. 666 ; *Whiteside* v. *United States,* 93 U. S. 247. We are therefore of opinion that the defendants cannot take refuge under the consent or acquiescence of the government agent in the disregard of these contracts.

To give to them the construction claimed by defendants is not only inconsistent with their language, but with the regulations of the President, the design of which was to permit every Indian on the reservation to engage in the work of cutting dead and down timber, and that no one should obtain more than his fair share of such privilege. The timber in question, if allowed to lie upon the land, would simply rot and go to waste, and its removal and sale were no detriment to the land or the government; and this right, if judicially exercised, would give support to a good many Indians who had no other means of earning a living. The regulations, however, properly limited the right to Indians " not well employed," and provided that no favoritism should be shown by the agent in the management of the business, and that no Indian should be permitted to monopolize the business for his own profit. In short, the object of these regulations was to prevent exactly what was done in this case, that is, the appropriation to a few Indians of the benefits

of the act to the exclusion of the many. It will be observed that while the defendants were interested in all these contracts, care was taken that one contract should not be made for the delivering of the gross amount of logs, but that five different contracts should be entered into with different Indians, undoubtedly for the very purpose of preventing a monopoly by a single person, the largest of these contracts being only for a million feet.

3. The third assignment of error is directed to the proper measure of damages, which were assessed at the value of the logs as they were banked upon the streams and lakes in the neighborhood of where they were cut. It is insisted that the proper measure was the value to the government of the timber before the Indians or the contractors had, by their labors, added to that value.

To determine the proper measure of damages, it is necessary to consider the exact relation of the defendants to this timber. They were certainly not innocent purchasers for value of the logs that were cut. All the logs were cut under contracts with individual Indians, by which the latter had agreed to cut, haul and deliver to the defendant, upon the Mississippi River, or waters tributary thereto, an aggregate of 2,750,000 feet of dead and down timber, defendants agreeing to pay to the Indian Department ten per cent of the purchase price as stumpage for such timber, which should be deducted from the price of $4 per thousand agreed to be paid. As a matter of fact, there were delivered on these contracts over 17,000,000 instead of 2,750,000 feet contracted for, a large proportion of which seems to have been cut from green and growing timber, though the quality of the timber is not in issue here. Defendants could not have failed to know that they were paying for a very much larger amount than they had agreed to buy, or than the Indians had any power to sell. They knew that their contracts had been approved by the Commissioner of Indian Affairs upon the basis of a certain quantity of dead and down timber, and that if the agent of the Indian Department had acquiesced in the amount and quality of timber actually cut, he had exceeded his authority, and his acts were not binding upon the government.

Granting that .the question that what constituted "dead and down" timber might be the subject of a *bona fide* dispute, there was no question but that the amount of timber received grossly exceeded the amount contracted for, and that an agreement to cut 2,750,000 feet could not be glossed over by the words "about" or "more or less" in any such way as to cover 17,000,000 feet.

The case of *Woodenware Co.* v. *United States*, 106 U. S. 432, is decisive of the law in this connection. That was also an action of trover brought by the United States for the value of 242 cords of ash timber cut from the Oneida reservation in the State of Wisconsin. The timber was knowingly and wrongfully taken from the reservation by Indians, and carried to a distant town, where it was sold to the Woodenware Company, which was not chargeable with any intentional wrong or misconduct or bad faith in the purchase. The timber on the ground, after it was felled, was worth twenty-five cents per cord, and at the town where the defendant bought it, $3.50 per cord. The question was whether the liability of the defendant should be measured by the value of the timber on the ground where it was cut, or at the town where it was delivered. It was held that where the trespass is the result of inadvertence or mistake, and the wrong was not intentional, the value of the property when first taken must govern ; or, if the conversion sued for was after value had been added to it by the work of the defendant, he should be credited with this addition. Upon the other hand, if the trespass be wilfully committed, the trespasser can obtain no credit for the labor expended upon it, and is liable for its full value when seized ; and if the defendant purchase it in its then condition, with no notice that it belonged to the United States, and with no intention to do wrong, he must respond by the same rule of damages as his vendor would, if he had been sued. "This right" (of the recovery of the property), said the court, "at the moment preceding the purchase by defendant at Depere, was perfect, with no right in any one to set up a claim for work and labor bestowed on it by the wrongdoer. It is also plain that by purchase from the wrongdoer, defendant did not acquire any better title to the

property than his vendor had. It is not a case where an innocent purchaser can defend himself under that plea. If it were, he would be liable to no damages at all, and no recovery could be had. On the contrary, it is a case to which the doctrine of *caveat emptor* applies, and hence the right of recovery in plaintiff."

The cases involving this distinction and in line with the *Woodenware* case are abundant, both in the Federal and state courts, and are too numerous even for citation. We do not see that the defendants are in any better position by the fact that the contracts were approved by the Commissioner of Indian Affairs, since it was not what was done in pursuance of these contracts but what was done in disregard of them, which lies at the basis of plaintiff's action. Had the contracts been adhered to, clearly there could have been no recovery. We are not called upon to explain the conduct of the government agent who superintended the cutting of this timber. It is sufficient to say, as already stated, that his acts in excess of his authority, which must have been well known to the defendants, afford them no protection. To say that all parties, including the Indians, the government agent and the defendants, may have honestly supposed that their right extended to all dead and down timber upon the lands described in the contracts, is to impute to them an ignorance of the English language. This might be ascribed to the Indians but not to the other parties. It is unnecessary to say that the defendants do not stand in a position of innocent purchasers in good faith.

It may admit of some question whether their advances of money and supplies to the Indians to carry on the logging operations was not a violation of the regulation that "each Indian shall provide his own logging outfit and supplies," but however this may be, it gives no color to the assertion that the defendants acted in good faith, since they could hardly have failed to know that their advances must have been greatly in excess of what was needed for preparing for market less than three million feet of logs.

We regard the rule laid down in the *Woodenware* case, that an intentional trespasser, or a purchaser from him, shall have

no credit for the labor he may have expended upon the property at the time of its conversion, as an eminently proper and wholesome one. It is, and has for many years been, notorious that under the various guises of Indian contracts, purchases of timber entries, or cutting timber for railway, mining or agricultural purposes, the timber lands of the United States are being denuded of all their substantial value by logging concerns gradually gathering to themselves all the valuable timber of the country, which Congress intended to reserve for the benefit of homestead entrymen, or the purchasers of land in small parcels. If trespassers under these circumstances were permitted to escape by the payment of the mere stumpage value of the standing timber, there would be a strong inducement upon the part of these operators to avail themselves of every opportunity of seizing this timber, since they would incur no greater liability than the payment of a nominal sum. It is only by denying them a credit for their labor expended upon it that the government can obtain an adequate reparation for this constantly growing evil, and trespassers be made to suffer some punishment for their depredations.

4. The fourth assignment is based upon the proposition that the contractors should have been allowed credit for the amount paid to the United States for stumpage on account of the 14,850,260 feet included in the verdict. The stumpage representing this quantity of timber would be $6400.

This payment was not made to the United States in reimbursement of their claim for timber, but under regulations of the President, and under their contracts with the Indians that they would pay ten per cent of the stipulated compensation of $4 per thousand feet to the Indian Department as stumpage, which should be deducted from the price of $4 per thousand feet, and under the condition that such stumpage should go to the poor fund of the tribe, from which its helpless members might be supported. This payment was not made to the government as vendor, but to be held by the Indian Department as trustee for the benefit of helpless Indians, and was as much a part of the stipulated price to be paid for the timber as the other ninety per cent of the $4 per thousand feet.

5. The fifth objection assigns as error the exclusion by the trial court of a telegram of March 16, 1898, from the Acting Commissioner of the Land Office to The Logging Company, stating simply that the Commissioner had accepted the bond of the defendants in lieu of the logs, and that the government agent had been directed. to release the logs. A like exception was taken to a letter from the special agent of the Land Office to The Logging Company, repeating the telegrams, and stating that the logs had been released. We do not see the materiality of these papers. There is no doubt that the bonds were accepted in lieu of the logs themselves, and as security for any judgment that might be obtained. Neither the telegram nor the letter add anything to the inferences to be derived from the face of the instruments.

6. The same remark may be made as to the exclusion of certain conversations of Charles A. Smith with Indians in the fall of 1891, wherein the Indians informed him that there was a large amount of dead and down timber on the reservation which could be cut. Of course, there was, or the contract would not have been made. We fail to see that these conversations had any bearing upon the question of the good faith of the defendants. The seventh, eighth and ninth assignments of error need no comment.

7. In the tenth assignment it is insisted that the court erred in taxing costs against the defendants. While the rule is well settled that costs cannot be taxed against the United States, the rule is believed to be universal, in civil cases at least, that the United States recover the same costs as if they were a private individual. We know of no case in this court directly adjudicating the liability of unsuccessful defendants for costs in actions brought by the United States, although it was assumed in *United States* v. *Sanborn,* 135 U. S. 271, 281, where the question arose as to particular fees included in a general bill. Throughout the elaborate opinion of Mr. Justice Harlan the liability of the defendant for costs was assumed, and such has been the ruling generally in the lower courts, although the reported cases upon the subject are rare. *United States* v. *Davis,* 54 Fed. Rep. 147. It has been assumed rather than decided.

8. The item of $353.69, reporter's fees for a transcript of the record used by the plaintiff in preparing its bill of exceptions on the former appeal, was improperly allowed.

By Rev. Stat. section 983, "lawful fees for exemplifications and copies of papers necessarily obtained for use on trials in cases where by law costs are recoverable in favor of the prevailing party, shall be taxed by the judge or clerk of the court;" and by rule 31, subdivision 3, of the Circuit Court of Appeals, " the cost of the transcript of the record from the court below shall be taxable in that court as costs in the case." It has been held in a number of cases that section 983 did not include a transcript of the evidence for the personal use of counsel in preparing a case for an appellate court. *Wooster* v. *Handy*, 23 Fed. Rep. 49, 60, by Judge Blatchford, who says the language implies that the copies must have been actually used on or in the trial or final hearing, or at least obtained for such use. In *The William Branfoot*, 52 Fed. Rep. 390, 395, it was held by Mr. Chief Justice Fuller that a copy of the official stenographer's notes, obtained for libellant by his counsel, was simply for convenience, and not a copy necessarily used on the trial, and the charge therefor was properly rejected. To the same effect are *Gunther* v. *Liverpool &c. Insurance Co.*, 10 Fed. Rep. 830; *Kelly* v. *Springfield Railway Co.*, 83 Fed. Rep. 183, and *Monahan* v. *Godkin*, 100 Fed. Rep. 196. This error, however, does not render it necessary to reverse the judgment of the court below. The amount of the reporter's fees, $356.69, may be deducted from the judgment.

In conclusion, we are of opinion that there was no error committed upon the last trial. The case was an aggravated one, the conduct of the companies wholly indefensible, and the right of the government to recover is entirely clear.

The judgment of the Court of Appeals, subject to the above deduction, is right, and it is, therefore,

*Affirmed.*