**UNITED STATES of America,
Plaintiff,**

v.

**Vincent LANDERS, Defendant.**

United States District Court,
S. D. New York.
April 21, 1953.

---

J. Edward Lumbard, U. S. Atty., for the S. D. of New York, New York City, for plaintiff (John M. Foley, Asst. U. S. Atty., New York City, of counsel).

Andrew J. Dritsas, New York City, for defendant (Albert Barnett Klepper, New York City, of counsel).

LEIBELL, District Judge.

This is an action by the United States of America for damages arising out of defendant's breach of contract. In substance the complaint alleges that the United States through its duly authorized agency, the War Assets Administration, offered to sell all or part of 1,600,-110 pounds of spodumene; that defendant on or about October 16, 1946, submitted a bid to purchase 1,600,000 pounds thereof for $16,401.13; that the War Assets Administration accepted defendant's bid; that on or about October 23, 1946, plaintiff made demand on

defendant for shipping instructions and for payment of the purchase price of the spodumene; that defendant failed to comply with plaintiff's demand; that on November 12, 1946, the plaintiff by letter notified defendant that, unless defendant paid the amount due, the spodumene would be sold for the account of the defendant; that defendant failed to comply and after ten days the plaintiff sold the spodumene for the account of defendant to two purchasers at a price which was $6,800.58 less than that which had been bid by defendant. Plaintiff prays judgment against defendant for the amount of plaintiff's loss, $6,800.58 with interest from November 22, 1946.

Defendant, in his answer, denied that the War Assets Administration had accepted his bid and denied that due demand for shipping instructions had been made by plaintiff and pleaded two special defenses.

As a first defense:

"Third: That by telegram dated October 31st, 1946, and confirmed by letter of the War Assets Administration dated November 1st, 1946, the award was cancelled and thereafter the defendant was informed by Harry J. Schnell, Chief Chemicals Section of the War Assets Administration that the defendant's bid was cancelled and the award was given to the next highest bidder, because of the alleged failure of the defendant to abide by all the terms of the bid; and, the defendant herein accepted the cancellation of the award as aforestated and relied on said cancellation."

As a second defense:[1]

"Fifth: That defendant's bid contains a memorandum in writing by the defendant making said bid 'subject to acquiring Plancor 546'."

"Sixth: That defendant bid for Plancor 546, but, did not receive the same, and that the conditions of defendant's bid in this action have not been met."

On the trial of the action plaintiff called as its only witness, Harry J. Schnell, and offered in evidence eleven exhibits. Defendant waived cross-examination of plaintiff's witness and rested his case at the conclusion of plaintiff's case. The facts proved are as follows:

In September 1946 the Philadelphia Regional Office of the War Assets Administration had for disposal, 1,600,110 pounds of spodumene[2], a lithium bearing ore. Lithium, the lightest of the metals, is an alkali metal which has various uses in the metallurgical industry as an alloy. In war it is used for flares.

Harry J. Schnell, Chief of the Chemical Division of the War Assets Administration's Regional Office at Philadelphia, was in charge of the sale of this surplus property which was located in a warehouse at Coplay, Pennsylvania. The warehouse had to be vacated by the Government on January 1, 1947. Mr. Schnell advertised the sale in New York City and Philadelphia newspapers. In addition he sent invitations to bid to those firms believed to have some interest in the subject of the sale. Fifty notices were sent out. Three bids were received by plaintiff; one from the Foote Mineral Company, another from the Metalloy Corporation, and a third from Vincent Landers, the defendant.

Landers' bid was the highest. It contained a handwritten notation at the bottom as follows: "This bid is subject to acquiring Plancor 546.[3] Shipts. within

---

1. Defendant was permitted to interpose his second defense at a pre-trial conference held on May 5, 1952; but as will hereinafter appear it is without merit.

2. Spodumene—(lithium, aluminum, silicon and oxygen). The Columbia Encyclopedia.

3. Plancor is an abbreviation for Defense Plant Corporation, a corporation created by the Reconstruction Finance Corporation pursuant to the Act of June 25, 1940, 54 Stat. 572, for purposes of furthering national defense. It was empowered, among other things, to purchase, lease, build and expand plants for the manu-

18 months—V. L." Schnell phoned Landers on the day the bids were opened, October 18, 1946, and informed him that his bid was unacceptable because of the written qualification. Schnell added that if Landers would withdraw the condition in writing the bid would be considered satisfactory to the government. Landers agreed to withdraw the condition. Subsequent to the phone conversation there was an exchange of correspondence. On October 18, 1946, Landers wrote the War Assets Administration (for the attention of Schnell) as follows:

"Confirming telephone conversation pertaining to my offer regarding subject matter please be advised that I anticipate acquiring the Magnesium plant—Plancor 546—located at Wingdale, N. Y., within the next two weeks.

"In the event this transaction is not culminated within that time, I will arrange to furnish you shipping instructions to another location.

"The undersigned will telephone you from Wilmington, on Monday, October 21st, about 3 PM."

On October 23, 1946, Landers sent the following telegram:

"WU U29 NL PD

Rockaway Beach NY Oct 22

War Assets Administration Attn Harry J. Schnell

Please Submit Sales Contract For Offering 34 PH  Stop  Will Execute And Return With Check And Shipping Instructions  Stop  Request No Special Privileges  Stop  Will Follow Standard Practice

Vincent Landers

Oct 23 910 A  Somers NY
23 PH EOMERS"

Schnell replied to the telegram on the same day, October 23, 1946, as follows:

"Pursuant to your telegram received today, we enclose herewith sales agreement covering your purchase of the Spodumene covered by Philadelphia Project No. 34.

"Please sign the white copy of this form and return it together with the green copy, keeping the pink for yourself. Please insert in the proper spaces your destination and shipping instructions. When you return the two copies of this memorandum please send also your check for the amount called for $16,401.13."

"P.S. Regulations require me to request your check by return mail."

When a week passed without further communication from the defendant, Schnell sent Landers a telegram on October 31, 1946, which Schnell confirmed by letter the next day. The text of the telegram reads:

"October 31, 1946

Vincent Landers
Somers, New York
Re Spodumene Unless Your Check And Signed Order Are In This Office By Noon Tomorrow Your Award Will Be Cancelled.

Schnell—Chief, Chemicals

HJS:mha"

Landers did not comply with the terms of the telegram. He did not send to Schnell either the signed sales agreement or a check. He ignored Schnell's letter of October 23rd and the telegram of October 31st.

On November 12, 1946, J. A. Lyons, Schnell's superior, wrote Landers as follows:

"Please take notice that this office has elected not to cancel the contract which resulted from the acceptance of your bid to purchase 1,600,110 pounds of spodumene as offered for sale by WAA through this Regional Office under title

---

facture of arms and ammunition.
  By a Joint Resolution dated June 30, 1945, C. 215, 59 Stat. 310, 15 U.S.C.A. § 611 note, Plancor was dissolved and

all its functions, powers, assets and liabilities transferred to the Reconstruction Finance Corporation.

Special Offering 34–PH on September 27, 1946.

"This Administration will hold you responsible for any risk of loss, damage or destruction to the property and for reasonable storage charges arising from its storage upon Government-owned or controlled premises, or elsewhere, where this Administration may store the property for your account and at your expense, in accordance with the standard conditions of sale under which the offer to sell was bid upon by you and which bid was accepted by this Administration. This will, of course, include any transportation charges which may accrue by reason of movement of the property.

"You are hereby notified that in the event you fail to make payment for the property purchased, in accordance with your obligations, as such obligations became fixed by acceptance of your bid, within ten days from the date of the receipt of this communication, it is the intention of this Administration to resell this property for your account upon such terms and conditions as this Administration deems proper, and this Administration hereby notifies you of the intent to hold you responsible in the amount of all loss and expense incurred by reason of such failure or default on your part."

On November 26, 1946, Schnell was authorized by his superiors to resell the spodumene. It was sold to the two other bidders at the prices specified in their original bids—to Foote Mineral Company, 1,200,110 pounds for $6,000.55, and the balance to Metalloy Corporation for $3,600. The difference between the price bid by Landers and that ultimately realized on the sale of the spodumene to the other bidders was $6,800.58.

Defendant's second defense, namely that the condition attached to his bid was never fulfilled and consequently no contract materialized, can be disposed of

quickly. His telegram of October 23, 1946, in which he requested Schnell to forward the sales contract, explicitly stated that he would "request no special privileges" and would "follow standard practice". In the light of Schnell's telephoned admonition that Landers must remove the condition by a writing, it appears that Landers was complying with that suggestion by sending the telegram of October 23, 1946.

The War Assets Administration's invitation to bidders was not an offer to sell. It was an advertisement for bids. The wording of the bid was an offer. The bid provides that "We, the undersigned, * * * submit * * * our bid or offer to purchase all or part of the spodumene * * *".

"An ordinary advertisement for bids or tenders is not itself an offer (to sell) but the bid or tender is an offer (to buy) which creates no right until accepted". Williston on Contracts, Vol. 1, Sec. 31, citing Levinson v. United States, 258 U.S. 198, 42 S.Ct. 275, 66 L.Ed. 563; United States v. Conti, 1 Cir., 119 F.2d 652, 655; Straw v. City of Williamsport, 286 Pa. 41, 132 A. 804. Landers' bid, conditioned on his acquisition of "Plancor 546", represented an offer which plaintiff declined to accept. Landers' telegram of October 23rd, taken together with his bid, constituted a new and unconditional offer. The telegram deleted the reservation which Landers had written as a postscript to his bid and which the government found objectionable. Plaintiff signified its assent to Landers' new offer by forwarding the sales agreement to Landers in a letter of October 23rd, which referred to Landers' telegram. Williston on Contracts, Vol. 1, Sec. 22A; Restatement of Contracts, Sec. 21.

Defendant's attorney appears to argue in his brief that the defendant's bid could be withdrawn at any time before the formal sales agreement was signed. If the argument had any legal merit, it is based on an incorrect assumption of fact. The defendant never

did in fact withdraw his bid and there was nothing in the terms of the bid which gave him the right to do so. Landers simply did nothing after he sent the telegram dated October 23, 1946. He did not execute the sales agreement; he did not send any shipping instructions; he did not send a check for the purchase price.

If Landers' bid, as amended, on October 23rd, and the government's acceptance thereof on October 23rd, constituted a contract, Landers' subsequent failure to even acknowledge the communications from the War Assets Administration constituted a breach of that contract. It certainly could not have been his then interpretation of the conditions of his bid that he had the right to withdraw his bid and was doing so. If that were true, he would have sent a written notice to that effect and that was not the government's interpretation of the terms of the bid or of Landers' conduct. Indeed, it would have been an improvident and loose way of conducting the government's business, to have the government go to all the expense of advertising and in other ways seeking bids, only to leave the bidder free to drop out at the last minute, after his bid had been accepted and before the formal sales agreement was signed. As Williston says "The rules governing such bidding (where bids are sought by advertising) are analogous to the rules governing auction sales". Applying that test, Landers was legally bound when his amended bid was accepted. If he later failed to execute a formal contract in accordance with the terms of the bid, he is liable for the loss his refusal has caused the government. No contention is made by the defendant that there was anything in the Sales Agreement, which Landers did not sign, that was inconsistent with the provisions of the bid and the Standard Terms and Conditions of Sale. In fact the Sales Agreement, which was mailed to Landers, was not offered as an exhibit by either party. It may be assumed that it was proper in form and content. This was not a building or road construction contract that would require the formal execution of a long and detailed contract and specifications by the bidder before a contract came into being. This was a simple sales contract of a specified quantity of a specified material. The only details needed for performance were shipping instructions from the purchaser and his check for the purchase price.

■ Landers' first defense asserts that the government rescinded his contract on October 31, 1946. A consideration of the testimony and exhibits received at the trial refutes that contention. Schnell's telegram of October 31st did not rescind the contract and relieve the defendant of any further obligation to the plaintiff, even if we assume that Schnell had the authority to do so. Defendant uses the word rescind as it has been defined by Black in his work on Rescission and Cancellation, Vol. 1, Sec. 1, as follows: "To rescind a contract is not merely to terminate it but to abrogate and undo it from the beginning, that is, not merely to release the parties from further obligation to each other in respect to the subject of the contract, but to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made." Plaintiff denies that any such interpretation can be attributed to Schnell's telegram of October 31st and denies that the telegram was sent for any such purpose. The invitation to bidders and the Standard Terms and Conditions attached to each invitation and bid, support the government's contention.

The invitation to bidders specifically provided that "Any bid which is accepted will be subject to the terms and conditions appearing on Pages 2-3-4 hereof"; and the invitation further provided that the bids were "under and subject to the Standard Conditions of Sale of the War Assets Administration, dated March 25, 1946 as modified or

supplemented by the additional terms and conditions, specified in this Special Offering No. 34 P.H.", (the spodumene).

The bid sheet, a form of the War Assets Administration, stated that "We (the bidders) submit to the War Assets Administration our bid or offer to purchase all or part of the Spodumene * * * pursuant to the foregoing Invitation and under and subject to the Standard Conditions of Sale of War Assets Administration dated March 25, 1946, set forth on the reverse of this sheet * * *."

The War Assets Administration's Standard Terms and Conditions of Sale provided (par. 5):

"Specific shipping instructions from Purchaser must be received by the Regional Office of War Assets Administration responsible for the sale within ten (10) days from the date of the Sales Memorandum; or if prior to the expiration of said ten day period purchaser notifies Seller that he will remove the property such removal must be effected within (15) days of the Sales Memorandum."

[This provision was important, as to the spodumene, because it was stored in a warehouse that had to be vacated by the government by January 1, 1947.]

Paragraph 7 of the Standard Terms provided:

"If Purchaser fails to issue shipping instructions or to remove the property within the applicable period prescribed in paragraph (5) above the risk of loss, damage or destruction of the property shall be upon Purchaser. In the event of such failure Purchaser shall, upon demand, pay to Seller reasonable storage charges if the property is stored on premises owned or controlled by the Government, or Seller may store the property elsewhere for the account and at the expense of Purchaser. Seller may also, upon such failure or in the event of default on the part of Purchaser in

making payment or otherwise, upon giving ten (10) days written notice to Purchaser, rescind the sale, or resell the property for the account of Purchaser upon such terms and conditions as it deems proper, and Purchaser shall, upon demand, pay to Seller the amount of all losses and expenses incurred by reason of such failure or default. The exercise by Seller of one or more of the rights herein specified will not preclude Seller from exercising any other rights it may have against Purchaser."

The telegram that Schnell sent Landers on October 31st was not final action of any kind. It was a threat to take action. It stated "Unless your check and signed order are in this office by noon tomorrow your award will be cancelled". Apparently the purpose of the telegram was to shock Landers into action. Landers had been sent the sales agreement on October 23rd and had not communicated with the War Assets Administration Regional Office in any way.

No employee of the Regional Office had the authority to vary in a substantial manner the Standard Terms and Conditions of Sale by a telegram. Any modification of the Standard Terms had to be put in writing and included in the Sales Memorandum in advance of the signing. One of the opening paragraphs in the Standard Terms and Conditions provides:

"The Sales Memorandum and these standard conditions of sale constitute the entire agreement between the parties with respect to the sale of the property specified in the Sales Memorandum. No variations from or modifications thereof, and no representations made or warranties given by any representative, agent or employee of Seller in variance thereof shall be of any effect unless specified in writing and included in the Sales Memorandum."

The manner in which the Seller (The War Assets Administration) could proceed, in the event of a default by the

purchaser (Landers) was set forth in paragraph 7 of the Standard Terms quoted above. The War Assets Administration could either rescind the sale or resell the property for the account of the purchaser if the purchaser defaulted, but the War Assets Administration had to give the purchaser ten days written notice before doing either. The telegram of October 31st which gave the purchaser until "noon tomorrow" to send in his check and the signed order, was not a notice under paragraph 7 of the Standard Terms and was ineffectual for any purpose. But the letter of November 12, 1946 which J. A. Lyons as Chief of Sales Group Two sent to Landers did comply with the provisions of paragraph 7 of the Standard Terms, and seems to have been prepared by an attorney with the provisions of paragraph 7 in mind. It stated that "this office has not elected to cancel the contract which resulted from the acceptance of your bid". The letter then went on to advise Landers that if he failed to make payment for the property purchased within ten days from the receipt of the letter, "it is the intention of this Administration to resell this property for (his) account", and to hold him, Landers, "responsible in the amount of all loss and expense incurred" by reason of his failure or default.

The War Assets Administration received no communication from Landers in answer to the formal notice of November 12, 1946. The War Assets Administration then proceeded to sell the spodumene to the two other bidders— to Foote Mineral Company on November 27, 1946 and to Metalloy Corporation about two weeks later.

██ Plaintiff further contends that if the telegram were subject to a construction that it constituted a rescission of the contract, it would not be binding on the government because Schnell lacked authority to rescind the contract. The

government is not bound by an act of one of its agents, if the said act is beyond the agent's authority. Moreover, it is incumbent upon one dealing with the government to ascertain at his own risk that he who purports to act for the government is acting within the scope of his authority. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, at page 384, 68 S.Ct. 1, 92 L.Ed. 10; Pine River Logging & Improvement Co. v. United States, 186 U.S. 279, at page 291, 22 S.Ct. 920, 46 L.Ed. 1164.

Schnell testified that he was a chemical engineer in charge of the Administration's chemical division in the Regional Office at Philadelphia. His duty was to dispose of and oversee the disposal of surplus chemical and allied materials after World War II. He was expected to provide for advertising, prepare invitations to bid, and to consummate the sales resulting therefrom. He had nothing to do with credit matters or with disputes that arose between purchasers and the Administration. Although he knew of no express limitation on his authority, he testified that his duties were specific. They do not indicate that he had the power to rescind a contract. Although he probably discussed the telegram with some of his superiors before he sent it, the record is barren of any evidence that would permit the court to conclude that anyone with authority specifically authorized Schnell to rescind the Landers contract. R. F. C. v. Martin Dennis Co., 3 Cir., 195 F.2d 698; United States v. Chickasha Cotton Oil Co., 10 Cir., 1940, 115 F.2d 135, at page 137; United States v. Thomas, 5 Cir., 107 F.2d 765, at page 766.

Although there are cases holding that the word "cancel" means "rescind", there are others which hold to the contrary.[4] The meaning given the word is invariably dictated by the circumstances surrounding the transaction which gave

---

4. Clegg v. Schvaneveldt, 79 Utah 195, 8 P.2d 620; Swan v. Great Northern Ry. Co., 40 N.D. 258, 168 N.W. 657, L.R.A. 1918F, 1063; Ireland v. Dick, 130 Pa. 299, 18 A. 735; Shelby County Trust & Banking Co. v. Security Ins. Co., 6 Cir., 1933, 66 F.2d 120. See Sawyer v. Sunset Mutual Life Ins. Co., Cal.App., 59 P.2d 208; Sanborn v. Ballanfonte, 98 Cal.App. 482, 277 P. 152.

rise to its use, as well as by the context in which the word is found. The word "rescind" itself has been refused its technical, legal definition when attendant facts and circumstances indicate the appropriateness of some different meaning. George H. Finlay & Co. v. Swirsky, 98 Conn. 666, 120 A. 561; Hurst v. Trow's Printing & Bookbinding Co., 2 Misc. 361, 22 N.Y.S. 371; Haaser v. A. C. Lehmann Co., 130 Conn. 219, 33 A.2d 135.

Schnell testified that the space occupied by the spodumene had been sold or leased by the government and that it was imperative that the property be removed as expeditiously as possible from the Coplay, Pennsylvania, warehouse. That is what prompted the telegram. Schnell did not want the matter delayed.

Schnell did not use the word "contract" in the telegram of October 31st. He used the word "award". He did not use the word "rescind." He used the word "cancelled". He did not say "recind the contract". His language was "cancel the award". The defendant cannot attach to the latter expression the same consequences that a formal notice of the cancellation of the contract might have had. Schnell simply meant that absent defendant's compliance with the terms of the telegram, the government would not sell the material to Landers which it had obligated itself to do by the award to Landers. Schnell's communication at best manifested an intent on the part of the War Assets Administration, if Landers did not comply, to terminate the contract in respect to the War Assets Administration's obligation to turn over the spodumene to Landers. There was no intent to relinquish any claim or right of action for damages that might arise in plaintiff's favor as a result of defendant's breach. Hayes v. City of Nashville, 6 Cir., 80 F. 641, at page 646, (opinion by Taft). Any such assumption has no rational basis, entirely apart from the lack of authority in Schnell, or in his superiors in the Regional Office, to give away any such claim of the government.

In view of the foregoing I conclude: That the defendant breached his contract to purchase the spodumene by failing to execute the sales agreement, pursuant to the letter sent defendant on October 23, 1946, and by failing to send in any shipping instructions, and by failing to forward his check for the purchase price; that the plaintiff on November 12th gave the defendant the ten-day notice required by the Standard Terms-Conditions to be given to a purchaser in default; that the defendant took no action pursuant to the ten-day notice; and that the plaintiff thereafter sold the spodumene for the defendant's account at a price that was $6,800.58 less than defendant's bid, pursuant to the notice and the Standard Terms and Conditions annexed to the bid. As a result of the defendant's breach of contract plaintiff has suffered damages in the said sum of $6,800.58. Interest is to be computed thereon at the rate of six per cent per annum, from December 15, 1946, the date when the last re-sale was made. Let judgment be entered accordingly.

This opinion will suffice under Rule 52 Federal Rules of Civil Procedure, as amended, 28 U.S.C.A., as the Court's Findings of Fact and Conclusions of Law.