## TRUSTEES OF DARTMOUTH COLLEGE v. INTERNATIONAL PAPER CO.

### (Circuit Court, D. New Hampshire. August 5, 1904.)

### No. 467.

1. TROVER—MEASURE OF DAMAGES—CUTTING AND CONVERSION OF TIMBER.

In an action of trover for the conversion of timber unlawfully cut by defendant from plaintiff's land, and which has been enhanced in value by his operations, the measure of damages recoverable if the trespass was unintentional is the value of the timber before cutting, but if it was willfully committed defendant is liable for the value of the timber at the time of demand or suit brought, however enhanced by his labor. The distinction is not on the ground of the allowance of exemplary damages in the latter case, but on the principle that in the former case defendant, by his improvement of the property in good faith, has acquired a certain right therein, and is entitled to a credit for the value added whenever the property is retaken, or plaintiff asserts his right thereto in any form of action.

2. SAME—UNINTENTIONAL TRESPASS—BURDEN OF PROOF.

In an action of trover for the conversion of timber cut and removed by defendant from plaintiff's land the burden of proving that the trespass was unintentional, as affecting the measure of damages, rests on the defendant.

3. SAME—GOOD FAITH—MEASURE OF PROOF.

To entitle the defendant in such case to an allowance on account of enhancing the value of the property in good faith, he is not required to prove freedom from negligence, but only that the trespass was not willful, or did not result from negligence or recklessness.

4. SAME.

In general, a trespasser who commenced the cutting of timber on land of another in good faith, in the belief that he had the right to do so, can-

---

¶ 1. See Trover and Conversion, vol. 47, Cent. Dig. §§ 270, 271.

not show such fact in an action for conversion of the timber to sustain a claim for an allowance for improvement made in the value of the timber after he acquired knowledge that his cutting was without right.

**5. SAME—EVIDENCE CONSIDERED.**

Evidence considered, and *held* to establish the claim of a corporation defendant that in cutting timber on land of plaintiff, although in fact a trespasser, it acted in good faith in the belief that it had acquired a substantial if not a technical right to so cut under a lease held by another, and to entitle it to an allowance, when sued for the trespass, for the value added to the timber cut through its labor and expenditure in manufacturing it into pulp.

**6. SAME—MEASURE OF DAMAGES.**

In an action of trover for the conversion of timber cut and removed by defendant from plaintiff's land, where the trespass was not willful, wanton, nor reckless, but defendant acted in good faith in the belief that it was within its rights, the measure of recovery is the stumpage value of the trees at the time they were cut.

At Law.

Streeter & Hollis, for plaintiff.

Drew, Jordan & Buckley, O. D. Baker, and D. W. Snow, for defendant.

LOWELL, District Judge. This is an action of trover. The declaration alleges the conversion of spruce, fir, and hemlock timber, and of pulp made therefrom. The defendant has suffered default, and the court has only to assess damages. To ascertain their amount the case has been submitted to a master. His findings concerning the amount of timber cut are not in dispute. By its default, therefore, the defendant has admitted conversion, and liability for the damage caused thereby. By the undisputed findings of the master the amount of timber cut has been ascertained, and it remains only to put the proper value thereon. The rule or measure of damages by which this value should be estimated has received so much discussion in various courts, federal, state, and English, and their decisions differ so greatly, that it is best to recur to general principles before stating the facts of this particular case.

Trespass is an action "sounding in damages," and the compensation for damage recoverable therein is, as the words imply, to be measured by the plaintiff's damage or loss arising from the defendant's trespass or wrongful act set out in the plaintiff's declaration. This is true alike of all forms of the action of trespass from assault to the latest development of the action of trespass on the case. In theory the statement just made includes all damages recoverable in any action of trespass. In fact, an addition has been made thereto by statute or the practice of some courts. Sometimes the plaintiff may expressly allege and prove as the result of the tort mental suffering or mortification, and may call on a jury to assess compensation therefor, as for damage done to limb or chattel. These cases are within the general statement above made. This right to recover has been enlarged into a right to recover enhanced damages in some cases where the plaintiff's material harm alleged in the declaration is accompanied by mental suffering or mortification. See Webb's Pollock on Torts, 219. By further development has arisen the doctrine of damages exemplary or punitive.

These are unknown to the common law, and, whatever be their form, are, in effect, recovered, not as damages suffered by the plaintiff, but as a penalty for the defendant's wrongful act analogous to that recovered by the plaintiff in a qui tam action. Though the measure of damages recoverable in all forms of the action of trespass is fixed by the plaintiff's damages arising from the trespass complained of, yet the amount of recovery arising from a given series of wrongful acts is not always the same, irrespective of the form of action. The same succession of events may be the basis of any one of several different forms of the action of trespass, and, as the legal effect of these events may be stated differently according to the plaintiff's point of view, the measure of damages in the different forms of action may differ. A common example of the plaintiff's right to elect between two forms of the action of trespass upon the happening of the same series of events is found where the plaintiff's goods are converted and afterwards sold by the wrongdoer. The plaintiff may sue in an action of trespass on the case sur trover, and will then recover the value of the goods converted at the time of conversion; or he may sue in an action of trespass on the case sur assumpsit, and will then recover the price received for the goods by the wrongdoer. The damages recoverable in the two actions may be quite different, and those recoverable in trover may be more or less than those recoverable in assumpsit. Ordinarily, the election between the two forms of action is at the plaintiff's discretion.

Where standing timber on the plaintiff's land is wrongfully cut, the plaintiff's choice of remedies is more extensive. (1) He may bring an action of trespass quare clausum, wherein he will recover the damage done to the real estate; that is to say, the diminution in the value of the real estate caused by the cutting. If he alleges, by way of aggravation, a trespass upon his personal property, viz., the logs, after severance from the realty, he may recover for that also, thus joining his two causes of complaint in one action. (2) He may bring trespass de bonis asportatis, wherein he will recover the damage done by carrying off the logs wrongfully cut. (3) He may bring trover, in which case he will recover the value of the personal property—the logs—at the time and place of conversion. As to the three forms of action just mentioned, see Warner v. Abbey, 112 Mass. 355. (4) He may bring replevin. By this action he will, in some jurisdictions, recover the logs themselves, and in others will recover their value variously estimated. In some jurisdictions the action of replevin sounds altogether in damages, and differs but little from the action of trover. (5) He may physically retake his severed property. By this act he will recover the property itself. Indeed, though he commit a breach of the peace in the recovery, yet he will still recover his property. His civil or criminal liability for his violence will not divest his title. See Pabst Brewing Co. v. Greenberg, 117 Fed. 135, 55 C. C. A. 151. Other forms of action, such as detinue, or a bill in equity, may be employed in some jurisdictions and under some circumstances; and the injured man may sometimes pursue more than one remedy at once. It is plain that in some instances the damages recovered in an action of trespass quare clausum will be greater than those recovered in

trover. In other instances the damages in trover will be the larger.

This is an action of trover, the gist of which is the conversion by the defendant of goods to which the plaintiff has the right of possession. "The plaintiff is bound to prove a right of possession in himself at the time of the conversion." U. S. v. Loughrey, 172 U. S. 206, 212, 19 Sup. Ct. 153, 43 L. Ed. 420. Mere refusal to deliver upon the plaintiff's demand is sufficient evidence of conversion; a fortiori, any positive act of the defendant which substantially deprives the plaintiff of that possession of the goods to which he is entitled. The declaration in this case alleges a conversion of timber and pulp. If at any time the plaintiff had an unqualified right to possess that timber or pulp, and the defendant refused to deliver the same upon proper demand, or otherwise deprived the plaintiff of his lawful possession, these facts are sufficient evidence of a conversion. See U. S. v. Loughrey, 172 U. S. 206, 216, 19 Sup. Ct. 153, 43 L. Ed. 420. The plaintiff will recover as damages the value of the property at the time and place of the conversion. Here the standing timber was the plaintiff's. Before severance it was a part of the plaintiff's real estate. When severed by the plaintiff or defendant or a third person, the logs were chattels of which the plaintiff had the right of possession. Woodenware Co. v. U. S., 106 U. S. 432, 1 Sup. Ct. 398, 27 L. Ed. 230; Northern Pacific R. R. v. Lewis, 162 U. S. 366, 16 Sup. Ct. 831, 40 L. Ed. 1002; Phillips v. Bowers, 7 Gray, 21; Whiting v. Adams, 66 Vt. 679, 30 Atl. 32, 25 L. R. A. 598, 44 Am. St. Rep. 875. By their removal from the plaintiff's land the plaintiff's right of possession was not divested, and the plaintiff here contends that even the conversion of the logs into pulp left the plaintiff with a right of possession to the product manufactured exclusively from its own logs. It is true that many dicta and some decisions may be found to the effect that the one and only conversion is that which occurs when the plaintiff's right of possession is first set at naught by the defendant; but without discussing these cases in detail, it may be said generally that they are opposed, not only to the weight of authority, but to fundamental principles of law.

But in Pine River Logging Co. v. U. S., 186 U. S. 279, 22 Sup. Ct. 920, 46 L. Ed. 1164, at page 293, 186 U. S., page 926, 22 Sup. Ct., 46 L. Ed. 1164, the Supreme Court, in substantial accord with most other courts, has said:

"Where the trespass is the result of inadvertence or mistake, and the wrong was not intentional, the value of the property when first taken must govern. Or, if the conversion sued for was after value had been added to it by the work of the defendant, he should be credited with this addition. Upon the other hand, if the trespass be willfully committed, the trespasser can obtain no credit for the labor expended upon it, and is liable for its full value when seized."

As here applicable, the rule thus laid down comes to this: If the defendant's admitted conversion was the result of inadvertence or mistake, it is liable only for stumpage, or at most for the value of the logs immediately after their cutting. If the conversion was

willful, the defendant is liable for the value of the goods, however improved. This rule, or one closely resembling it, is generally recognized, though courts are not unanimous. See Baker v. Wheeler, 8 Wend. 505, 24 Am. Dec. 66; Powers v. Tilley, 87 Me. 34, 32 Atl. 714, 47 Am. St. Rep. 304; Wing v. Milliken, 91 Me. 387, 40 Atl. 138, 64 Am. St. Rep. 238; Glaspy v. Cabot, 135 Mass. 435; Peterson v. Polk, 67 Miss. 163, 6 South. 615; Bly v. U. S., 4 Dill. 464, Fed. Cas. No. 1,581.

To decide the case at bar it is important to know not only the general rule thus declared, but its basis in our system of law. The distinction between the two measures of damages is spoken of in some opinions as one between damages compensatory and damages exemplary. The second measure is sometimes described as if imposed by way of punishment. State v. Shevlin Co., 66 Minn. 217, 68 N. W. 973; Beede v. Lamprey, 64 N. H. 510, 15 Atl. 133, 10 Am. St. Rep. 426. But the analogy is misleading, as appears from this consideration, among others: The second measure of damages is imposed only where the property converted has been enhanced in value. The defendant's bad faith would be the same had the logs been burned, or converted into pulp, and exemplary damages would be the same in both cases; but in the former case no more than their value before burning could be recovered in this action. From one point of view, indeed, the higher measure of damages gives no more than compensation. If the wrongdoer's improvements belong to the original owner, the latter gets no more than compensation when their value is awarded to him. As between the two measures of damages, the choice depends upon the plaintiff's unqualified ownership of the property as improved by the defendant's labor. If this unqualified ownership exists, the higher measure of damages gives no more than compensation for a legal wrong. If the defendant, by his labor, has gained a right of property in the goods he has converted, the damages should be computed by a lower measure.

By what principle does the law give to a defendant a right to the value of the improvements he has made in another's property which he has converted? Though he trespass innocently, yet he must make good the plaintiff's loss, but he may be entitled, under some circumstances, to an allowance from the owner by reason of the improvement made. Sedgwick on Damages, 903, 915. This principle of justice, as it is deemed to be, has obvious application where recovery is sought for the wrongful cutting of timber. If the plaintiff is deemed to have the right immediately to possess the logs through one or more transformations which enhance their value, the ordinary rule of damages in an action of trover will permit the plaintiff to state the defendant's conversion as of any time the plaintiff is pleased to select, and so the real damage done to the plaintiff may be enhanced many fold by including therein the value added to his property by the defendant's operations. In some cases this is deemed unjust, not by reason of the form of the plaintiff's action, but by a rule of substantive law. In some cases the improvement gives to the trespasser a qualified right of property in the goods improved. Here is to be found the basis of the two measures of damage above stated, and not in the theory of punishment. Not-

withstanding much confusion of language in many decisions, the principle above stated is recognized in those cases which are best reasoned and most authoritative.    See Silsbury v. McCoon, 3 N. Y. 379, 53 Am. Dec. 307; Powers v. United States, 119 Fed. 562, 56 C. C. A. 128; Anderson v. Besser (Mich.) 91 N. W. 737.    To obtain this right the improvement must be made in good faith.    This substantial right of the defendant must be available to him, whatever be the form of remedy selected by the plaintiff.    An action of trespass quare clausum hardly calls for an exercise of the rule.    An action of trespass de bonis ordinarily calls for a more limited exercise of the rule than does the action of trespass sur trover.    If the rule is to have its full effect, it must be applicable also where the plaintiff recovers the property without recourse to law.    This is especially desirable, indeed, for if the plaintiff can hold his improved and transmuted property which he has physically retaken without allowance to the defendant, while in an action he can recover but a small part of the value of this improved property, the plaintiff will be disposed to resort to physical recovery without the aid of the law, even if force and a breach of the peace be the result.    That a plaintiff may recover more in one form of action than in another ordinarily involves no serious hardship.    The plaintiff ordinarily has his choice among different forms of action.    But that a man may lawfully retain property which he has retaken by unlawful violence, many times the value of that which he could have recovered by the form of action most favorable to him, cannot be allowed by any system which calls itself law.    See Gates v. Rifle Co., 70 Mich. 309, 38 N. W. 245, for a failure to recognize this.    Accordingly, though with some exceptions and a good deal of hesitation, most courts recognize that in the case of the cutting of timber the defendant may obtain some allowance for increased value, whatever be the form of proceeding, provided that in improving the plaintiff's property he has acted in good faith.    As the allowance sought by the defendant involves an exception established upon the ordinary measure of damages recoverable in an action of trespass, the burden of proving the facts upon which the allowance is based rests upon the defendant (United States v. Homestake Co., 117 Fed. 481, 54 C. C. A. 303; United States v. Baxter [C. C.] 46 Fed. 350; United States v. Ordway [C. C.] 30 Fed. 31; Mississippi River Logging Co. v. Page, 68 Minn. 269, 71 N. W. 4; Hoxsie v. Empire Co., 41 Minn. 548, 43 N. W. 476; Powers v. Tilley, 87 Me. 34, 32 Atl. 714, 47 Am. St. Rep. 304): though it seems that no specific allegation or claim for allowance need be made in the pleadings.    That the burden of proving good faith rests upon the defendant shows that we are not here dealing with exemplary or punitive damages, properly so called.    The burden of showing a right to these rests always upon the plaintiff.

Unfortunately, the precise measure of the allowance to the defendant for his improvements has been stated by different courts—or by the same court—in many ways.    In theory the allowance should equal the cost of the defendant's improvement, not to exceed the consequent enhancement of value in the property converted.    But sometimes the plaintiff has been limited to the recovery of (a) stumpage, or, in the case of coal, of reasonable royalty (Hilton v. Woods, L. R. 4 Eq. 432; Liv-

ingston v. Rawyards Co., 5 A. C. 25; United States v. Homestake Co., 117 Fed. 481, 54 C. C. A. 303; United States v. Northern Pacific R. R. [C. C.] 67 Fed. 890; King v. Merriman, 38 Minn. 47, 35 N. W. 570; Whitney v. Huntington, 37 Minn. 197, 33 N. W. 561; Chappell v. Puget Sound Co., 27 Wash. 63, 67 Pac. 391; Miss. Co. v. Page, 68 Minn. 269, 71 N. W. 4; Illinois Cent. R. R. v. Leblanc, 74 Miss. 626, 21 South. 748; Forsyth v. Wells, 41 Pa. 291, 80 Am. Dec. 617); sometimes (b) the value after severance, less expense of severing (see Durant Mining Co. v. Percy Mining Co., 93 Fed. 166, 167, 35 C. C. A. 252; Colorado Co. v. Turck, 70 Fed. 294, 17 C. C. A. 128); sometimes (c) stumpage plus profit (Winchester v. Craig, 33 Mich. 205; Anderson v. Besser [Mich.] 91 N. W. 737); sometimes (d) value at severance, less what it would have cost the plaintiff to sever (see Morgan v. Powell, 3 Q. B. 278); sometimes (e) value at time of action brought, or at some other time after severance, less expense of improvement (see Jegon v. Vivian, L. R. 6 Ch. 742; United Merthyr Co., L. R. 15 Eq. 46; Powers v. United States, 119 Fed. 562, 56 C. C. A. 128; Herdic v. Young, 55 Pa. 176, 93 Am. Dec. 739); sometimes (f) value immediately after severance, on the theory that there can be no conversion of chattels until after severance from the realty (see United States v. Van Winkle, 51 C. C. A. 533, 113 Fed. 903; White v. Yawkey, 108 Ala. 270, 19 South. 360, 32 L. R. A. 199, 54 Am. St. Rep. 159; Ivy Co. v. Alabama Co., 135 Ala. 579, 33 South. 547, 93 Am. St. Rep. 46; Franklin Coal Co. v. McMillan, 49 Md. 549, 33 Am. Rep. 280; Blaen Co. v. McCulloh, 59 Md. 403, 43 Am. Rep. 560; Morgan v. Powell, 3 Q. B. 278; Martin v. Porter, 5 M. & W. 351; Beede v. Lamprey, 64 N. H. 510, 15 Atl. 133, 10 Am. St. Rep. 426); sometimes (g) value when removed from plaintiff's land, because the conversion is not deemed complete until then (Wright v. Skinner, 34 Fla. 453, 16 South. 335); sometimes (h) defendant's profit received (Colorado Mining Co. v. Turck, 70 Fed. 294, 17 C. C. A. 128); sometimes (i) value at time of action brought, or at some other time after severance, less value added by defendant (Coal Co. v. Coal Co., 24 Colo. 116, 48 Pac. 1045; Peters Co. v. Lesh, 119 Ind. 98, 20 N. E. 291, 12 Am. St. Rep. 367). Some of these rules seem to have been adopted as rough and ready measures of convenience, some without recognition of the difference between them. Each and all are deemed to furnish an allowance for the value of improvements made in good faith upon the property of another, and all show that diminished damages are permitted by way of allowance to a defendant, rather than are enchanced damages inflicted for his punishment.

From what has been said it follows that, in order to reduce their liability, this defendant must show that its action in converting the plaintiff's property was in good faith. There has been considerable discussion as to the meaning of the term "good faith" in this connection. The good faith which will protect the defendant is not incompatible with some degree of negligence. Almost any trespass upon the rights of another which is not willful arises, in whole or in part, from the defendant's ignorance of something which he might have discovered had he exercised a certain degree of care. "Trespasses on the land of another, not willful, always imply some degree of negligence." Franklin Coal Co. v. McMillan, 49 Md. 549, 559, 33 Am. Rep. 280.

In most of the cases in which the defendant has given an allowance for the enhancement of value which he had caused in the object converted he had shown some degree of negligence. In not a few he had lacked the care of ordinary men under the circumstances. Yet this was not held to prevent some allowance and a reduction of damages. See Gates v. Comstock, 113 Mich. 127, 71 N. W. 515. All the language of the courts cannot be reconciled (see Donovan v. Consol. Coal Co., 187 Ill. 28, 58 N. E. 290, 79 Am. St. Rep. 206), but, upon the whole, it seems that the defendant is bound only to negative willful injury to the known property of another, and willful disregard of another's rights (King v. Merriman, 38 Minn. 47, 35 N. W. 570). Some opinions require that the defendant's mistake should be reasonable, but to require this would call upon the defendant to negative negligence. See Mississippi River Logging Co. v. Page, 68 Minn. 269, 71 N. W. 4. If the injury is caused by negligence, as distinguished from willfulness, wantonness, or recklessness, it seems that the defendant is still entitled to his allowance. In any case the plaintiff will recover complete compensation for his actual damage in the ordinary sense of the words.

From these general principles we pass to the facts of this case, bearing in mind that we have to determine only if the defendant's conversion, admitted to be tortious, was in such good faith that the defendant should receive some allowance for the improvements it has made in the plaintiff's logs. Following the order of reference at the defendant's request the master has properly added findings bearing upon "questions relating to willfulness of the conversion, whether the conversion was made in good faith or bad faith, and whether, under the facts of this case, the plaintiff is entitled to recover more than just compensation." The evidence upon which the master based his findings is before the court, and his findings are challenged in 114 exceptions filed by the defendant. The weight to be attached to the master's report and the standing of the exceptions thereto were discussed and determined in the opinion filed in this case December 28, 1903. 132 Fed. 89. Following the rule there laid down, the findings and exceptions have been carefully considered. A brief statement of the facts, as explained by the master's findings, is as follows:

The plaintiff owned timber land. In 1888 it executed a certain instrument. This purported to lease to one Van Dyke the land here in question for 20 years to cut therefrom 3,000,000 feet a year, or 60,000,000 feet in 20 years, of spruce and cedar, and as much fir as the grantee wished, paying as stumpage $1.25 per thousand feet. (The right given to cut pine may be neglected, as it is not involved in this case.) The title in the logs was expressed to remain in the plaintiff until payment therefor. Certain restrictions were imposed upon the method of cutting. Under this instrument there was some cutting, not here in question. In 1893 Van Dyke executed an assignment of this lease to the Androscoggin Timber Supply Company, hereinafter called the "Supply Company." This was a corporation organized by five other corporations, which owned all its stock. By the by-laws these corporate shareholders agreed to divide the stumpage acquired by the Supply Company in proportion to their holdings of stock in that company. Soon after the incorporation of the Supply Company one of

these five corporations, the Rumford Falls Paper Company, hereinafter called the Rumford Company, contracted to buy the stock of three of its associates. These three agreements to buy and sell were carried out respectively in 1895, in 1898, and by the Otis Company not until after suit in 1900. After these three agreements had been made, there were thus left but two unincumbered stockholders in the Supply Company: (1) the Rumford Company, owning or under contract to buy four-fifths of the stock, and (2) the Rumford Falls Sulphite Company, hereinafter called the "Sulphite Company," owning one-fifth. In 1894, 1895, and 1896, the Rumford Company, with the knowledge and consent of the Sulphite Company, cut some timber, paying the plaintiff the stumpage due according to the Van Dyke lease. The plaintiff did not admit the validity of Van Dyke's assignment to the Supply Company of his lease. The Rumford Company asserted that the assignment was valid. As the plaintiff had no objection to the cutting by the Rumford Company, the logs were cut without determination of the validity of the assignment.

About the 1st of January, 1898, the defendant, a large corporation for the manufacture of paper from pulp, bought the mill of the Rumford Company and the logs which the Rumford Company had been cutting for that season upon the plaintiff's land. It contracted to buy the Rumford Company's timber lands and the four-fifths of the stock of the Supply Company which was owned by or was under contract of delivery to the Rumford Company. The defendant's intention was manifest to get the right to cut timber both on the land owned by the Rumford Company and upon the plaintiff's land, the latter by virtue of the ownership which the defendant was to acquire in the stock of the Supply Company. This latter company was assumed to hold the rights of Van Dyke under the original lease given by the plaintiff to him. In May, 1898, the defendant bought the mill of the Sulphite Company and its stock in the Supply Company. In August, 1898, Burbank, manager of the defendant, made arrangements to cut timber on the plaintiff's land. In September the cutting began.

The defendant's good faith, which it must prove in order to obtain allowance for its improvements, must be predicated upon some supposed right to cut the timber. The defendant knew that it did not own the land in fee. This the master has found, and this is proved by the contracts made by the defendant with the loggers. Chisholm, the defendant's president, had this knowledge. Thomas, who prepared the contracts for cutting, and who was Burbank's chief subordinate, had this general knowledge, and the master has found that Burbank also had some knowledge. The defendant's supposed right must, therefore, depend upon two elements: First, upon the Van Dyke lease, and the validity of its transfer to the Supply Company; second, upon the acquirement by the defendant of some rights which had belonged to the Supply Company. If either of these two elements was wanting, the defendant had no right to cut. Unless the defendant believed that both elements existed, it could not believe it had a right to cut.

As to the first element: The Van Dyke lease was valid. Van Dyke had assigned it and his rights arising thereunder to the Supply Company. The plaintiff has from time to time denied the validity of this

assignment, but has given no reason for the denial, and has omitted to argue the matter, though challenged to do so. It must be taken, therefore, that the Supply Company stood in Van Dyke's shoes. The defendant, therefore, if at any time it reasonably believed that it had acquired in law or in equity all the stock of the Supply Company, must then have reasonably believed that it had a right in law or in equity to cut timber on the plaintiff's land in accordance with the terms of the Van Dyke lease. As to the second element: The defendant's acquirement, real or supposed, of some right to cut belonging to the Supply Company, rested upon one or both of two separate transactions: (a) its contract to buy the Rumford's Company's holdings; (b) its purchase of the Sulphite Company's holdings. It is most convenient to examine these transactions separately.

(a) The master has found that before the defendant's first entry "questions about the transfer of the stock (i. e., the Rumford holdings) were in actual controversy." This must be taken to mean that even then there was doubt if the defendant would get the Supply Company stock from the Rumford Company, and so there must have been doubt if the defendant would get any right from the Rumford Company to cut timber on the plaintiff's land. The master has found, in substance, that Burbank at this time had little or no knowledge of "the controversy relating to the transfer of stock." He did know, however, that the stock in the Supply Company had not been turned over to the defendant. The report makes little mention of the knowledge of the controversy possessed at this time by other officers and agents of the defendant, but Chisholm, the defendant's president, must have had full knowledge of every controversy which related to the contract with the Rumford Company. The master finds that the contracts to cut were made "in the absence of Mr. Chisholm, and perhaps without his knowledge." How far a corporation can be said to be acting in good faith where it shows affirmatively that its agent X. did act in good faith because he was ignorant of conditions known to its agent Y., who was ignorant of the act done, need not here be discussed. We are not here dealing with an attempt to estop or otherwise to bind a corporation by showing its bad faith, but with a case in which the corporation must prove its good faith. At the time that cutting was begun, the master has found that Burbank had "very little actual information as to the condition of the title, and that he was without any definite idea as to the real rights of the parties concerned. Culpability, therefore, in respect to the original entry, so far as it exists, rests in the fact that he acted in an important matter, upon the assumption hereafter referred to, without reasonable care and investigation." "In fact, no investigation was made for the purpose of ascertaining the relative rights of the various parties. Still I do not think there was a conscious intent upon the part of Mr. Burbank, at the time of the original entry, and at the time the severance of the timber began, to invade or injure the property of this particular plaintiff." The defendant's right under the Rumford contract was involved in a controversy which was known to defendant's president. Affirmative proof or finding of the defendant's good faith is thus lacking. The cutting began about September 1, 1898, and ended about February 1, 1899, the logs being piled on the

banks of the streams by February 10th. As to the defendant's rights under the Rumford contract the situation was changing. The controversy regarding the transfer of the Rumford holdings developed. Soon after the middle of October, Chisholm "was averse to a transfer of the (Otis Company's) ownership in the stock of the (Supply Company) to the (Rumford Company)." If this transfer by the Otis Company (of which Chisholm was president) to the Rumford Company was not made, the latter could not carry out its contract with the defendant, and so the Rumford contract would afford the defendant none of the Supply Company's rights to cut the logs in question. The defendant's president, therefore, knew at that time that the defendant's right to cut, as based upon the agreement with the Rumford Company, was at least doubtful. By November, at the latest, Burbank knew of the controversy with the Rumford Company. The date at which Chisholm first learned of the cutting he professed that he could not remember. The defendant cannot prove its own good faith by showing that the bad faith of its president arose from his connection with another corporation, the Otis Company. For example, let us suppose that the alleged good faith of a corporation involves a belief that a deed is genuine, and let us suppose further that its forgery has become notorious by reason of newspaper reports of a trial in which its genuineness is involved. That the agents of the corporation got this knowledge of the forgery as members of the public, rather than as agents of the corporation, does not establish the corporation's good faith. Those cases in which knowledge of the corporation's agent had been held not to be knowledge of the corporation are quite different from the case at bar. The defendant has suggested in argument that its manager, Burbank, was ignorant of this controversy, and acted throughout in good faith. Even if this were true, it would avail the defendant nothing. A corporation's good faith is not established by proving the good faith of some one of its agents or employés. But this was not true. In November, 1898, there was an interview concerning the Rumford contract between Burbank, acting for the defendant, and a representative of the Rumford Company, at which the master finds that the attitude of Burbank was not entirely frank, and, in effect, concealed from the Rumford Company that cutting was going on. The defendant has tried to put a different interpretation on this interview, but the master saw and heard the witnesses, and his findings of fact are accepted. On December 22d the defendant declared its agreement with the Rumford Company to be at an end, and thereafter it knew that any right to cut based upon the agreement was at an end. Although the Rumford Company did not acquiesce absolutely in the attempted rescission of the contract, the subsequent negotiations did not warrant the defendant in supposing that the Rumford contract gave it any ownership of the Supply Company's stock in law or in equity. From this it follows that by November the defendant knew that its right, past, present, or future, to cut on the plaintiff's land, as based upon its contract with the Rumford Company, was in doubt, and by December 22d at the latest that doubt had ended in a certainty of failure. So far as the Rumford contract is concerned, the defendant has not established its good faith in November, while its bad faith in December is clear.

The later history may be summarized here, being fully stated in the master's report.   The Rumford Company did not know of the cutting until early in February, 1899, when it promptly and expressly notified the defendant not to remove the logs.   The defendant removed the logs in spite of the protest, floated them down the river, and manufactured them into pulp.   The master has found "that the defendant had more knowledge of the condition of the title at the time the timber was removed from the grant than it had at the time of the original entry and of the Thomas-Burbank contracts, to which I have already referred, and therefore, in conclusion upon this branch of the case, while I do not find that the defendant, at the time of the removal of the timber from the landings upon the banks of the streams, had a particular conscious purpose to injure this particular plaintiff, I do find that the defendant, then knowing the controversy and the conditions which made it doubtful whether the stock would ever be transferred, and being aware of the probability that it would not become the owner through such instrumentality, failed to be influenced by such conditions, and, acting upon the idea that, being in, it would go ahead and take the consequences, removed the timber in willful disregard of the controversy and of the question of title.   In this sense, and to this extent, the conversion, if the final removal of the timber from the territory of the plaintiff can be treated as a conversion, was in willful and wanton disregard of the rights of the owner, whatever it might turn out to be."  The plaintiff had no knowledge of the cutting until April or May, about the time when the logs were removed.   In July it brought a suit, for which, under the practice of New Hampshire, has been substituted the suit at bar.   On June 1, 1900, the Supply Company assigned to the plaintiff its right of action against the defendant.

As applied to the various periods of time here in controversy, the master's findings may be still further summarized.   In September, when the cutting began, the defendant was acting in professed reliance upon its own rights under its contract with the Rumford Company, though a controversy over that contract then existed.   In November or December, when the cutting was at its height, the defendant increasingly supposed that the contract above mentioned would fail, and at last repudiated it altogether.   It thus came to know, so far as the Rumford contract was concerned, that it was without right, legal or equitable, to cut the timber.   Thus we have indifference in September, bad faith in November and December, and manifest bad faith in February.   This does not amount to affirmative proof by the defendant of good faith sufficient to warrant an allowance to it for its improvements.

The defendant has urged that the question of its good faith in relying upon the Rumford contract must be determined as of the date when the cutting began.   To hold this would be to overlook the principle upon which is based the allowance to a defendant for improvements made in good faith.   Speaking generally, a trespasser who begins his trespass in good faith cannot show this fact in support of an allowance for improvements made after bad faith has supervened.   That A. cuts down one tree on B.'s premises, believing he has a good right to do so, will not ordinarily affect the amount he must pay for cutting down other trees after he has found out that he is without right.   Trotter v.

McLean, 13 Ch. D. 574. Doubtless some account should be taken of the defendant's situation in determining its good faith. One who in good faith has almost finished his cutting, and who then discovers that his act is without legal right, may sometimes go forward in good faith, if he believes that the real owner will not object to his doing so, and this although he is unable to obtain the real owner's consent. Especially may he go forward where the right to cut is in real doubt, and suspension of the enterprise will cause serious loss. Here it may have been reasonable to protect the timber from deterioration, but the defendant cannot establish its good faith toward the Rumford Company while totally disregarding the Rumford Company's notice not to cut, even though the Rumford Company's right to give notice was but indirectly derived from the legal owner. This disregard and the defendant's concealment of its acts tend to deprive it of this excuse. To communicate with the plaintiff at once would have been easy. See Chappell v. Puget Sound Co., 27 Wash. 63, 67 Pac. 391, 91 Am. St. Rep. 820. I find, therefore, that the evidence concerning the Rumford contract and the defendant's acts in reliance and in pretended reliance thereon do not establish such good faith on the defendant's part as to warrant its claim for improvements. While the master has made no explicit finding on this head, I understand that the conclusion stated is in accordance with his findings, and it is based upon them.

(b) There is left the consideration of the purchase of the Sulphite Company by the defendant. While he fenced a good deal in his testimony, the defendant's president, Chisholm, seems to have reached the conclusion that the defendant's case must stand or fall upon this consideration alone. By the Sulphite purchase, the defendant became the owner of one-fifth of the stock of the Supply Company. To convert this ownership of stock into a complete right to cut timber required certain formalities fixed by the Supply Company's by-laws. No attempt was made to comply with these, and the purchase thus left the defendant without complete right to cut. The defendant has no defense available at law. But the potential right it acquired by the purchase may bear upon its good faith. It must be borne in mind that the Sulphite Company, by ownership of one-fifth of the Supply Company's stock, by the Supply Company's by-laws, and by the nature and purpose of the Supply Company's organization, was entitled to one-fifth of the stumpage conveyed by the Van Dyke lease, say 12,000,000 feet—very nearly the amount which the defendant converted. This incomplete right to stumpage had passed to the defendant. Had the defendant taken the proper formal steps, it could have transmuted this inchoate right into a complete legal right to cut the timber upon the payment of a sum which, taken in connection with the cuttings of its fellow stockholders, would have come to about $1.25 a thousand net. In fact it cut without taking these formal steps, and with some reliance upon the Rumford contract, not very ingenuous, which has now failed it. But beneath the Rumford transaction were the actual rights acquired by the Sulphite purchase, always known to the defendant's officers. The question of good faith is often one of degree, particularly in transactions as complicated as were these. The defendant's conduct was not always ingenuous. At times it pretended one thing, when it knew the opposite

was true; but I think it always believed it had a real right to cut this timber, and its right, as derived from the Sulphite purchase, though incomplete, was substantial. As Chisholm's testimony shows, the defendant's reliance rested more and more upon the Sulphite holdings. An earlier hope, too long persisted in, of acquiring a more complete right through the Rumford contract, does not so establish the defendant's willfulness, wantonness, or recklessness as to deprive it of its allowance for improvements. In none of the cases in which the value of these improvements has been forfeited to the plaintiff by reason of the defendant's bad faith had the defendant proceeded upon so substantial a right as that possessed by this defendant through the Sulphite purchase. Upon this part of the case the court is without much help from the master's findings, probably because at the argument before him counsel insisted upon the Rumford contract and neglected the Sulphite purchase. Considering that the master has not found in terms either that the defendant's conversion was altogether in bad faith or that it was not in good faith, but has found only facts from which inferences of good faith or bad faith may be drawn, I do not think that my inference of good faith, based upon a fact which the master has found, but upon which he did not comment, requires that I should sustain any exception to his findings. If, however, it be necessary to specify an exception which is to be sustained, the sixty-first will serve the purpose, wherein the defendant complains of the master's omission to find "that its actual ownership of said one-fifth, and its contract ownership of said four-fifths, in said Supply Company, and its beneficial interest in the stumpage upon said grant resulting therefrom, warranted the defendant in believing that it might justifiably exercise the rights of said Supply Company in the above respects, and the defendant did in fact so believe in good faith." I find as a fact that the defendant, by the Sulphite purchase, supposed in good faith that it had acquired the right which belonged to the Supply Company to cut the logs in question. To this finding and ruling the plaintiff's exception is noted, if the exception is needed to protect the plaintiff's rights.

Having thus found that the defendant believed it had acquired the right of the Supply Company to cut timber to an amount substantially equal to that converted, the court must last determine if the defendant's failure to observe the terms of the Van Dyke lease shall deprive it of an allowance for its improvements. This was hardly contended by the plaintiff. So far as the question of good faith is concerned, we are now to assume that the defendant stands in the shoes of Van Dyke or of the Supply Company, his assignee; and neither Van Dyke nor the Supply Company would have been liable for the pulp value of logs which they had removed before payment of stumpage, or which they had cut, though the same were not covered by the lease. So far as improper cutting is concerned, the terms of the defendant's contracts with the loggers show that the defendant's fault, at the worst, was a failure by want of sufficient inspection to secure the observation of the terms of the lease. As logs so cut would not be cut under the lease, the lessee could not escape by paying stumpage at $1.25, but such a breach of the terms of the lease would not necessarily or ordinarily imply bad faith.

It follows, therefore, that the defendant is entitled to that allowance for improvements which is made to one who in good faith converts the property of another. What is that allowance? The variations in making it have been set out above. This court is bound to follow the rules laid down by the Supreme Court. Unfortunately, that court has not always spoken with entire clearness. In Woodenware Co. v. United States, 106 U. S. 432, 1 Sup. Ct. 398, 27 L. Ed. 230, two possible measures of damages were dealt with: (1) The value of the timber after it was felled, and (2) the value when prepared for manufacture. As the conversion was not in good faith, the latter value was given, but the former seems to have been assumed to be the proper alternative where good faith was shown. Yet cases were cited with approval by the court, which held that the value of coal in the mine was the proper measure in case of trespass in good faith. In Pine River Logging Co. v. United States, 186 U. S. 279, 293, 22 Sup. Ct. 920, 46 L. Ed. 1164, the higher value was awarded for a willful trespass. The proper measure of damages where the conversion was in good faith was stated as follows: "The value of the property when first taken must govern; or, if the conversion sued for was after value had been added to it by the work of the defendant, he should be credited with this addition." In the headnote the rule is stated: "If the trespass had been the result of inadvertence or mistake, and the wrong was not intentional, the stumpage value of the timber when first cut would be the proper measure of damages." In United States v. St. Anthony R. R., 192 U. S. 524, 24 Sup. Ct. 333, 48 L. Ed. 548, the parties had agreed that the value of the timber where cut was $1.50 per thousand, and upon delivery to defendant was $12.35. The court held that the cutting was in good faith, and said, "We think the measure of damages should be the value of the timber after it was cut at the place where it was cut." Page 542, 192 U. S., page 339, 24 Sup. Ct., 48 L. Ed. 548. While the language thus used by the Supreme Court, upon the whole, approves as measure of damages the value of the logs immediately after their separation from the freehold, it is plain that the difference between this value and stumpage has never been expressly considered by that court. On technical grounds it is possible to argue with some force that the plaintiff should be given the value immediately after severance, but the stumpage value better accords with the principles upon which the allowance for improvements is made. Neither measure is strictly accurate, as has been pointed out already, but, if the defendant is to be allowed for any improvements, then to deprive him of the value of the improvement first in time and most necessary, viz., that arising from severance from the realty, is to make the technical difference between real property in the shape of a standing tree and personal property in the shape of a felled tree the cause of a great difference in substantial rights. The weight of authority outside the Supreme Court, on the whole, supports the allowance of stumpage only, and with some doubt I have decided to allow only that in this case.

Judgment for $49,102.94 and interest.